**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BACKPAGE.COM, LLC,<br>2501 Oak Lawn Avenue<br>Dallas, TX 75219<br><br>Plaintiff,<br><br>v.<br><br>LORETTA E. LYNCH, in her official capacity as<br>Attorney General of the United States of America,<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1.      This is an action challenging the constitutionality of the "Stop Advertising

Victims of Exploitation" Act (the "SAVE Act"), which amended 18 U.S.C. § 1591, and was

enacted as part of Public Law 114-22 on May 29, 2015.  The Act added the term "advertises"

among the predicate acts for criminal sex trafficking in Section 1591, punishable by prison

terms ranging from ten years to life.

2.      Statements of Congressional sponsors and others in support of the SAVE Act

and prior bills that led to the Act emphasized their intent to target the classified advertising

website Backpage.com.  Members of Congress and others have assailed Backpage.com for

many years, despite the website's extensive efforts to prevent, screen and block improper ads

from users.  Three states enacted criminal statutes to censor adult ads on Backpage.com, but

– 1 –

federal courts struck down all three laws, holding that the laws would have chilled First Amendment protected speech, were unconstitutionally vague and overbroad, lacked sufficient scienter requirements, and could not withstand strict scrutiny.

3. Provisions of the SAVE Act targeting websites and others that publish or disseminate speech are also unconstitutionally vague, overbroad and infringe First Amendment rights for similar reasons.

4. First, the SAVE Act does not define "advertises" or "advertising." By any customary definition, "advertisers" are the third parties who place advertisements, not the operators of websites or newspapers where the ads appear. Websites and newspapers are publishers entitled to First Amendment protection, which cannot be held criminally liable absent proof they had knowledge that a specific ad or other communication was illegal. Yet the SAVE Act leaves it unclear whether websites and other publishers and intermediaries themselves are regarded as "advertisers." The ambiguity of the terms of the SAVE Act is compounded by legislators' statements that the Act was intended to impose criminal liability on Backpage.com (or other websites) for "facilitating" or "profiting" from sex trafficking when individuals misuse the site.

5. Second, interpreting the terms "advertising" and "advertiser" according to common meanings, the SAVE Act potentially imposes nonsensical *mens rea* requirements that also contravene First Amendment principles. Applying customary definitions, the Act prescribes a lower *mens rea* requirement for a website that may financially benefit from having published an ad, than for a person directly involved in sex trafficking who placed the ad. This final text of the law is a reversal from prior bills that led to the SAVE Act.

Originally, the Act included by design a higher *mens rea* standard for websites and other publishers to ensure they could not be liable absent proof they had knowledge a specific ad was for sex trafficking and participated in a venture to bring it about, while individuals who placed ads or committed other predicate acts of sex trafficking could be convicted under the less rigorous standard of reckless disregard.  Yet, in an eleventh-hour amendment and without any discussion or debate, the *mens rea* requirement in the final version of the SAVE Act was enacted to require higher *mens rea* for one who "advertises," *i.e.,* the party placing an ad, while the lesser standard of reckless disregard may apply to a party like a website that may benefit financially from the "advertising."  Thus, the SAVE Act, as enacted, makes it ambiguous what level of *mens rea* applies to websites and other publishers.

6.     Third, if the SAVE Act were interpreted to permit criminal liability if a website receives an allegation that a post concerns sex trafficking, this would create a notice-and-takedown regime that would impermissibly chill speech.  Contrary to statements of some of the SAVE Act's Congressional supporters, criminal liability cannot constitutionally be imposed on a website merely for providing a forum for speech that some individuals misuse for sex trafficking.  Given the enormous volume of third-party content they receive and disseminate every day, websites cannot possibly review every post to guarantee nothing is unlawful.  Although it is unclear what the SAVE Act means, if it imposes notice-based criminal liability, then the Act is also unconstitutional because it would permit a "heckler's veto" contrary to *Reno v. ACLU*, 521 U.S. 844 (1997).

7.     On the whole, the SAVE Act fails to give websites, publishers and others a reasonable opportunity to know what conduct is prohibited and what is permitted.  With all

its vagaries, the Act could allow ad hoc and subjective interpretations by prosecutors with attendant dangers of arbitrary and discriminatory application.  And, given the severe penalties under the Act—up to life imprisonment—the risks and likely speech-chilling effect of the law is also severe.  As a result, the Court should declare the SAVE Act unconstitutional and enjoin its enforcement.

## PARTIES

8.      Plaintiff Backpage.com, LLC is a limited liability company, organized and existing under the laws of Delaware, with its principal place of business in Dallas, Texas. Backpage.com operates an online classified advertising service available to the public in all fifty states and the District of Columbia.

9.      Defendant Attorney General Loretta Lynch heads the United States Department of Justice ("DOJ"), which is the agency of the United States government responsible for enforcement of federal criminal laws.  Defendant Lynch has ultimate responsibility for supervising all operations and functions of the DOJ, including regarding decisions whether to prosecute under federal criminal laws.

## JURISDICTION AND VENUE

10.     This action arises under the United States Constitution, particularly the First and Fifth Amendments.

11.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     This Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, because the case presents an actual case or controversy within the Court's jurisdiction.

13.     This Court has authority to award attorneys' fees and costs pursuant to 28 U.S.C. § 2412(b).

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

**A.      Backpage.com**

15.     Backpage.com is an online classified advertising service, located online at www.backpage.com.  Backpage.com launched in 2004 and provides services in all fifty states and the District of Columbia.

16.     Users of Backpage.com may post ads in a number of categories (*e.g.*, local places, buy/sell/trade, automotive, rentals, real estate, jobs, dating, adult and services) and subcategories.  Users post millions of ads every month.  Backpage.com is the second-largest classified ad website in the United States, after Craigslist.

17.     Users provide all content for their ads on Backpage.com, including all text, titles, and photographs.  Backpage.com does not dictate any content, although it does screen, block and remove ads that violate the website's terms of use.

18.     Backpage.com prohibits illegal content and activity on its website and takes numerous steps to prevent such misuse, especially to guard against any human trafficking or child exploitation.   Backpage.com has voluntarily employed extensive monitoring to identify improper content, including automated filtering and manual review.  Backpage.com

voluntarily reports suspect ads to the National Center for Missing and Exploited Children. Backpage.com regularly works with local, state and federal law enforcement to support investigations and prosecutions, including promptly responding to subpoenas, providing training to law enforcement, removing and blocking posts at their request, and even conducting independent research to assist in rescuing victims and arresting and prosecuting criminals.

**B.      Public Officials' Demands to Censor Online Classified Advertising**

19.      From 2007-2010, many public officials pressured the online classified ad website Craigslist to eliminate its category for adult services ads.  For example, the Sheriff of Cook County, Illinois sued Craigslist in 2009 claiming that such ads constituted a public nuisance.  But the case was dismissed on the pleadings because the court held that Craigslist was immune from liability for third-party content under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009).  As that court stated, online services do not "cause" postings except "in the sense of providing a place where people can post," they "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts," and having an adult services category "is not unlawful in itself nor does it necessarily call for unlawful content."  *Id.* at 966, 968-69.

20.      In the same period, a group of seventeen state attorneys general pressured Craigslist to eliminate adult-oriented ads on its website.  In September 2010, Craigslist succumbed and removed the adult services category from its website.  Shortly thereafter, the state attorneys general targeted Backpage.com.

21.     Other public officials, including U.S. senators and representatives, have since joined in with similar demands of censorship, including the following:

      a.     On March 23, 2012, nineteen senators wrote to Village Voice Media (the parent company of Backpage.com at the time) demanding it "remove the adult services section of Backpage.com."

      b.     On May 10, 2012, the House of Representatives passed House Resolution 649 targeting Backpage.com and "call[ing] on all Internet media providers to immediately eliminate 'adult entertainment' sections and [similar] classified advertising."

      c.     On October 5, 2012, six U.S. senators wrote to the company that acquired the print publications of Village Voice Media, threatening to continue to hold them "accountable" until "shutting down Backpage's 'adult entertainment' section … has been achieved."

      d.     On December 21, 2012, the U.S. Senate passed Senate Resolution 439 demanding "eliminat[ion] of the 'adult entertainment' section of the classified advertising website Backpage.com."

22.     Many individual senators and representatives (including Senator Kirk and Representative Wagner, the principal sponsors of various versions of the SAVE Act) have made and publicized similar demands.  However, the members of Congress making these demands have not acknowledged in their public statements Backpage.com's efforts to prevent and combat sex trafficking.

23.     Backpage.com has maintained that censorship is not a solution to human trafficking or child exploitation.  Many experts and law enforcement officials agree that politically-motivated responses, including whack-a-mole censorship against one website after another, are ill-advised and will accomplish nothing.  They advocate that a better approach is to use the Internet and to work with cooperative website providers such as Backpage.com to identify, investigate and prosecute illegal conduct and rescue victims.

**C.     States Enact Unconstitutional Laws Targeting Backpage.com**

24.     In 2012, three states passed laws creating felony offenses expressly targeting Backpage.com.  *See, e.g.*, Wash. Rev. Code § 9.68A.104 (offense in statute since repealed was entitled "advertising commercial sexual abuse of a minor").  In each instance, federal courts enjoined the laws, finding them unconstitutional under the First Amendment and preempted by Section 230 of the CDA.  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 23, 2013).

25.     Noting that escort ads have long been permitted (and escort services are licensed and regulated in many states), these cases held that the states' efforts to regulate or effectively block such ads "would likely chill protected speech." *McKenna*, 881 F. Supp. 2d at 1282.  The courts rejected arguments that the laws only prohibited advertisements for illegal transactions and instead found that they were overbroad and could not survive strict scrutiny. *Hoffman*, 2013 WL 1249063, at *8.  As the Tennessee court summarized:

> Child sexual exploitation is an evil that states have an undisputed interest in
> dispelling.  However despicable this evil, though, the Constitution stands as a
> shield against broad assaults by states on the rights of their citizens.  The

Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix.

*Cooper*, 939 F. Supp. 2d at 813.

26.     In all three cases, the courts ultimately entered permanent injunctions and awarded Backpage.com attorneys' fees. *See, e.g., Backpage.com, LLC v. Cooper*, 2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013).

## D.     Legislative History of the SAVE Act

27.     Several different bills called "the SAVE Act" were introduced in the House and Senate in the 113th and 114th sessions of Congress.  The bill ultimately enacted was SA 273, an amendment to S. 178, but several of the other bills reflect the genesis of the SAVE Act and how the terms of the Act were significantly modified before final passage.

28.     According to sponsors and other supporters, the SAVE Act bills were targeted at Backpage.com.  For example:

a.     Senator Mark Kirk (Illinois):   "I intended to go after Backpage.com …. We really ought to be able to charge them …."  161 CONG. REC. S1458 (daily ed. Mar. 12, 2015).

b.     Representative Ann Wagner (Missouri):  "[G]overnment intervention is necessary to end facilitation of sex trafficking by Web sites like Backpage.com and others who commercially advertise this criminal activity. … [Such] companies … should not be allowed to operate."  160 CONG. REC. H4521 (daily ed. May 20, 2014).

c.     Representative Jaime Herrera-Beutler (Washington):  "We are seeking to disable Web sites like Backpage.com …."  160 CONG. REC. H4518-19 (daily ed. May 20, 2014).

E.      **The Various Bills and Versions of the SAVE Act**

29.     The history of the various "SAVE Act" bills and the version that finally

became law is as follows:

*H.R. 4225 (113th Congress)*

30.     On March 13, 2014, Representative Wagner introduced H.R. 4225, called the

"Stop Advertising Victims of Exploitation Act of 2014."  160 CONG. REC. H2432 (daily ed.

Mar. 13, 2014).  The bill provided for a new offense, to be codified as 18 U.S.C. § 1591A, as

follows:

> Whoever, in or affecting interstate or foreign commerce, knowingly benefits
> financially from, receives anything of value from, or distributes advertising
> that offers a commercial sex act in a manner prohibited under section 1591,
> shall be fined under this title, imprisoned not more than 5 years, or both.

31.     On April 30, 2014, the House Judiciary Committee held a markup session on

H.R. 4225 and adopted and sent to the full House an amended version of the bill.  The

substitute bill omitted all of the prior language and the proposed new section 1591A.  Rather

than create a new offense, the amended version of H.R. 4225 proposed to add "advertises" to

the list of predicate acts that may constitute sex trafficking under 18 U.S.C. § 1591.  The bill

also added a new *mens rea* requirement for any party charged with benefiting financially

from advertising, requiring proof that such a defendant had knowledge that a given ad was

for sex trafficking of a victim who was underage or was subject to force, fraud or coercion.

32.     These amendments to H.R. 4225 were intended to address concerns that the

prior version of the bill was overbroad and unconstitutional, as it potentially could have

imposed criminal liability on websites and other Internet companies that attempt to filter and

monitor content, though inevitably such efforts cannot be 100% successful.  *See Markup of*

*H.R. 3530, etc.*, H. Comm. on the Judiciary, 113th Cong. 71 (Apr. 30, 2014) (statement of

Rep. Nadler).

33.    As House Judiciary Committee Chairman Robert Goodlatte (Virginia) stated:

"In order to run afoul of this provision, [an Internet] company that financially benefits from

an advertisement must know of the ad, the fact that the victim … is a minor or adult who is

involved due to force, fraud or coercion.  This is a high evidentiary burden." *Markup of*

*H.R. 3530, etc.*, H. Comm. on the Judiciary, 113th Cong. 86 (Apr. 30, 2014)

34.    The amended version of H.R. 4225 adopted by the House Judiciary Committee

(by a vote of 24-3), would have revised 18 U.S.C. § 1591(a) as follows (added language

underscored):

(a)    Whoever knowingly—

(1)    in or affecting interstate or foreign commerce, or within the special
maritime and territorial jurisdiction of the United States, recruits,
entices, harbors, transports, provides, obtains, advertises, or
maintains by any means a person; or

(2)    benefits, financially or by receiving anything of value, from
participation in a venture which has engaged in an act described in
violation of paragraph (1),

knowing, or, except where, in an offense under paragraph (2) the act
constituting the violation of paragraph (1) is advertising, in reckless disregard
of the fact, that means of force, threats of force, fraud, coercion described in
subsection (e)(2), or any combination of such means will be used to cause the
person to engage in a commercial sex act, or that the person has not attained
the age of 18 years and will be caused to engage in a commercial sex act, shall
be punished as provided in subsection (b).

35.    As reported to the full House, the amended version of H.R. 4225 was intended

to "raise the bar" for any prosecution against websites or others that publish ads.

160 CONG. REC. H4515 (daily ed. May 20, 2014) (statement of Rep. Goodlatte).  The House

Report for the amended bill stated:

> This provision requires the government to prove that defendants accused of
> benefitting financially through the sale of such advertising knew that the
> victim was a minor or a victim of force, fraud, or coercion. … H.R. 4225 as
> reported requires the government to prove beyond a reasonable doubt that a
> defendant who benefits from the advertising of a trafficking victim under
> 18 U.S.C. § 1591(a)(2) knew that the advertising involved a victim, who the
> defendant knew was a minor or a victim of force, fraud, or coercion.

H.R. Rep. No. 113-451, at 3-4 (May 15, 2014).

36.     The House passed H.R. 4225 on May 20, 2014 by a vote of 392-19.  The bill

was referred to the Senate, which did not take action before the 113th Congress ended.

### S. 2536 (113th Congress)

37.     On June 26, 2014, Senators Kirk and Feinstein introduced another "SAVE

Act," S. 2536.  Their bill proposed to create a different new offense as 18 U.S.C. § 1591A,

which, among other things, would have imposed prison terms of up to ten years for persons

who "knowingly sell, commercially promote, place or maintain an adult advertisement …

with reckless disregard of the fact that the [ad] facilitates or is designed to facilitate" an

offense under 18 U.S.C. § 1591 or any similar state law where the victim is underage.

38.     The bill was never addressed in committee or referred to the full Senate and it

too died when the 113th Congress ended.

### H.R. 285 (114th Congress)

39.     On January 12, 2015, Representative Wagner introduced H.R. 285 in the

House, again called "the SAVE Act" and identical to H.R. 4225 from the prior session.

40.     H.R. 285 was presented in the House with the same explanation as the prior year's bill, *i.e.*, it set a higher bar for criminal liability of parties that are not advertisers but who could be alleged to benefit from advertising, requiring a *mens rea* that such defendants must have knowledge a specific ad is for sex trafficking of a victim who is underage or subject to force, fraud or coercion.  *See* 161 CONG. REC. H596 (daily ed. Jan. 27, 2015) (statement of Rep. Sensenbrenner).  For example:

a.     Representative Jackson Lee (Texas):  "[S]ome have raised questions about how the advertising prohibitions under this bill would apply to online companies," but "the standard of mens rea" protects websites that "wind up finding things on their site that they may not have had anything to do with."  161 CONG. REC. H598 (daily ed. Jan. 27, 2015).

b.     Representative Jim Sensenbrenner (Wisconsin):  The "'knowingly' standard" "emphatically" refutes concerns that the "net might be too broad" because a website "will not be caught up if an advertisement for sex trafficking appears without their knowledge."  161 CONG. REC. H600 (daily ed. Jan. 27, 2015).

c.     Representative Blake Farenthold (Texas):  "I want the legislative history of this bill to show that 'knowingly' is important"; the bill was "carefully crafted" so that "Internet companies and legitimate Web sites are protected" unless "[t]hey … know that they are advertising for victims of human trafficking." 161 CONG. REC. H599 (daily ed. Jan. 27, 2015).

41.     On January 27, 2015, the House passed H.R. 285 on a voice vote, and referred the bill to the Senate.

42.     In the Senate, H.R. 285 was referred to the Senate Judiciary Committee.  But that committee did not take action on the bill, and it was never referred to the full Senate.

### *S. 572 (114th Congress)*

43.     On February 25, 2015, Senator Kirk introduced S. 572, another SAVE Act, the terms of which were identical to H.R. 285.  The bill was referred to the Senate Judiciary Committee, but no action was taken on it.

### *S. 178, the Justice for Victims of Trafficking Act, and SA 173 (114th Congress)*

44.     Another bill, S. 178, called the "Justice for Victims of Trafficking Act" was introduced by Senator John Cornyn of Texas on January 13, 2015.  This bill initially proposed to add new financial penalties for defendants convicted of a number of crimes (including peonage, sexual abuse and sex trafficking) and to establish a fund to distribute these moneys to victims.  At the same time, other bills were introduced in the Senate, including S. 166 (the "Stop Exploitation Through Trafficking Act," a series of provisions designed to assist minors who are victims of sex trafficking) and S. 575 (the "HERO Act," a bill to hire and train injured veterans to support investigations of cyber-related crimes).  These various bills were combined and, with numerous other amendments, ultimately passed as S. 178 by the Senate on April 22, 2015.

45.     On March 10, 2015, Senator Kirk proposed an amendment to S. 178, SA 273, again called the "SAVE Act" and identical to the prior House bills, H.R. 4225 and H.R. 285.  161 CONG. REC. S1389 (daily ed. Mar. 10, 2015) (statement of Sen. Kirk).

46.     However, SA 273 was not introduced for consideration by the Senate until April 22, 2015, and then the language of the amendment had changed significantly.  Instead

of the heightened level of *mens rea* predecessor bills set for parties who do not place ads but could be alleged to benefit financially from advertising, the revised version of SA 273 reversed the standards to require a higher *mens rea* for individuals who advertise sex trafficking victims, while leaving in place a lower reckless disregard standard for parties alleged to be beneficiaries of such advertising.

47.     Thus, without any discussion, debate or referral to any committee, the terms of the SAVE Act were changed to amend 18 U.S.C. § 1591(a) as follows (added language is underscored; language that was in prior bills (H.R. 4225, H.R. 285, and S. 572) but omitted in the final version is crossed out):

(a)     Whoever knowingly—

(1)     in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, or maintains by any means a person; or

(2)     benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where , in an offense under paragraph (2) the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

48.     This version of SA 273 was enacted and approved as an amendment to S. 178 by the Senate on April 22, 2015, the day it was introduced, by a vote of 97-2.  *See* 161 CONG. REC. S2333 (daily ed. Apr. 22, 2015).

49.     The House considered and approved S. 178 without further discussion or debate on May 19, 2015—including no consideration of the changes to the SAVE Act.

50.     The President signed S. 178 into law as Pub. L. 114-29 on May 29, 2015.

**F.     Legislators' Statements About Intent of the SAVE Act**

51.     As discussed above, the express intent of the House Judiciary Committee, House leaders and other members regarding the two predecessor versions of the SAVE Act (H.R. 4225 and H.R. 285) was clear:  Individuals who place ads on a website or in a publication are the ones who "advertise," and they could be criminally liable if they had knowledge or recklessly disregarded that the person being advertised will be caused to engage in a commercial sex act and is underage or will be subjected to force, fraud or coercion.  On the other hand, websites and other publishers were not treated as advertisers but could be criminally liable only with proof establishing a higher *mens rea* for having knowingly benefited from advertising of sex trafficking, *i.e.*, that such a defendant knows a specific ad was for sex trafficking and that the individual advertised is underage or has been subjected to force, fraud or coercion.

52.     The House bills expressly raised the *mens rea* requirement for beneficiary liability to protect websites and other publishers (particularly ones that screen or block content, as Backpage.com does) and to avoid constitutional infirmity.

53.     Yet, some legislators expressed views that the various bills called the "SAVE Act" would impose criminal liability on website providers for "facilitating" or "profiting" from ads related to sex trafficking even if a provider had no knowledge about a specific ad but merely was aware the site had been misused by third-party users.  For example:

a.      Senator Feinstein:  "[T]here are Internet companies that are profiting [and] [t]his must stop;" the Act "imposes liability on Web sites that know that their sites are being used to advertise minors for sex."  161 Cong. Rec. S1622 (daily ed. Mar. 18, 2015).

b.      Representative Wagner:  "[G]overnment intervention is necessary to end facilitation of sex trafficking by Web sites like Backpage and others …."  160 Cong. Rec. H4516 (daily ed. May 20, 2014).

54.     Legislators also recognized the SAVE Act was vague and might not survive constitutional scrutiny because of its potential application to websites and other Internet providers:

a.      Representative Jerrold Nadler (New York), addressing H.R. 285: "[T]he bill could leave legitimate companies potentially liable for advertising that, despite their best efforts and use of algorithms to prevent it, may appear on their sites. Rather than simply go after advertisers, this bill, as drafted would also target anyone who benefits financially from such ads.  That could include the platform on which the ads are posted, even though they made efforts to avoid such ads being on their platform ….  Although the bill requires knowledge that the services being advertised involves sex trafficking, this standard is vague enough that it still could sweep up those who are unsuccessful in blocking such an ad before it [is] placed." *Organizational Meeting, etc.* 114th Cong. 77 (Jan. 21, 2015).

b.      Representative Suzan DelBene (Washington), addressing H.R. 285:  "I am not sure this bill can survive constitutional scrutiny," noting the decision in

*McKenna*, 881 F. Supp. 2d 1262, invalidating the Washington statute "that would have created new criminal penalties for sites like Backpage responsible for posting these ads," and stating, "I believe this bill may also have similar challenges." *Markup of H.R. 3530, etc.*, H. Comm. on the Judiciary, 113th Cong. 71 (Apr. 30, 2014).

55.     Such concerns were well taken and correct, especially after the eleventh-hour amendment of the SAVE Act.

## CLAIMS FOR RELIEF

### COUNT I
### Vagueness and Overbreadth Under the First and Fifth Amendments

56.     Backpage.com incorporates all previous paragraphs as if fully set forth herein.

57.     The SAVE Act targets and imposes criminal liability on websites and others that publish speech and therefore must comply with the First and Fifth Amendments.

58.     The SAVE Act is unconstitutionally vague under the Fifth Amendment because it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).  The Act also violates the Fifth Amendment because it is "so standardless that it authorizes or encourages seriously discriminatory enforcement," and thereby "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis. *Id.* The vagueness of the SAVE Act raises "special First Amendment concerns" and therefore is subject to more exacting scrutiny because it threatens criminal penalties that present an "obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

59.     The SAVE Act creates a chilling effect on the exercise of First Amendment rights from the threat of prosecution against websites and other publishers, without regard to the prospects of success or failure.  *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

60.     The SAVE Act's imposition of criminal penalties for a person who "advertises" and its reference to "advertising" as a violation of the Act—without defining these terms—creates an ambiguity regarding whether and how websites and others that publish advertisements may be subject to the Act.  By all customary definitions an "advertiser" is the party who places an advertisement in a publication.  Websites and newspapers where advertisements appear are *not* advertisers.  Yet, the terms and history of the SAVE Act suggest the amendments to Section 1591 it effected could be interpreted to treat websites and publishers as "advertisers," despite ordinary meanings.

61.     The eleventh-hour revision of the SAVE Act reversing the *mens rea* requirements for those who "advertise" and others that allegedly "benefit financially" injects significant ambiguity about the new "advertising" prong of Section 1591 and the potential liability of websites and other publishers.

## COUNT II
### Lack of Sufficient *Mens Rea* Under the First Amendment

62.     Backpage.com incorporates all previous paragraphs as if fully set forth herein.

63.     To impose criminal liability on a party for distributing speech requires *mens rea* of the fact that the communication contains prohibited material, *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015), and, more specifically, that the distributor has knowledge of the nature and content of the materials being disseminated which makes them unlawful.  *See*

*Smith v. California*, 361 U.S. 147, 153-54 (1960).  To the extent criminality turns on the age of a person depicted or described in communicative materials (*e.g*., Section 1591's provisions applicable to a person who "has not attained the age of 18 years"), the First Amendment requires *mens rea* that the defendant knows the age of the person involved.  *See United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994).

64.     Given its vagaries, the SAVE Act is unconstitutional because it may be used to impose criminal liability on website publishers and other distributors of third-party speech without proof that they had knowledge a given advertisement or communication was for sex trafficking of an adult or a minor.

65.     Depending on the interpretation of the vague and undefined terms "advertises" and "advertising," the SAVE Act potentially imposes a lower *mens rea* requirement to impose felony liability on a website for publishing an ad (reckless disregard) than for a person directly involved in sex trafficking who placed the ad (for whom knowledge would be required).

66.     Alternatively, the SAVE Act could be interpreted to allow prosecution against websites and other publishers as "advertisers" (requiring proof of knowledge) *or* for allegedly benefiting financially from "advertising" (based on reckless disregard), thus giving prosecutors the choice of *mens rea* based on their discretionary interpretation of the Act.

## COUNT III
### Notice-Based Criminal Liability Under the First Amendment

67.     Backpage.com incorporates all previous paragraphs as if fully set forth herein.

68.     The SAVE Act could be applied to allow prosecution and criminal liability based on a notice-and-takedown regime whereby any allegation of illegal third-party content by any official or private party, whether unfounded or not, will chill speech and cause websites and other publishers to err on the side of censorship.

69.     Given the millions of advertisements and other posts submitted each month by users on Backpage.com and other websites, it is impossible for such sites to ensure that their screening processes are perfect and that no content might concern improper or unlawful activities.

70.     But to the extent the SAVE Act imposes notice-based criminal liability, this "would confer broad powers of censorship in the form of the 'heckler's veto'" on anyone who questions or objects to certain third-party content, in violation of the First Amendment. *Reno,* 521 U.S. at 880.

## COUNT IV
## Declaratory Judgment Under 28 U.S.C. §§ 2201, 2202; and Fed. R. Civ. P. 57

71.     Backpage.com incorporates all previous paragraphs as if fully set forth herein.

72.     This action presents an actual case or controversy concerning the SAVE Act, its interpretation, and infringement of rights under the First and Fifth Amendments. Declaratory relief is therefore necessary and appropriate.

73.     Because the SAVE Act violates the First and Fifth Amendments concerning websites and others that publish or disseminate speech, Backpage.com asks for a declaration pursuant to 28 U.S.C. § 2201 that the Act is invalid and unenforceable in this regard.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Backpage.com respectfully requests that this Court enter judgment in its favor and providing the following relief:

A.     A declaratory judgment stating that the SAVE Act amendments to 18 U.S.C. § 1591 with regard to websites, publishers or other parties that distribute or disseminate speech are unconstitutional under the First and Fifth Amendments of the United States Constitution;

B.     A permanent injunction enjoining prosecution, enforcement or criminal liability under 18 U.S.C. § 1591, as amended by the SAVE Act, with regard to websites, publishers or other parties that distribute or disseminate speech;

C.     An award to Backpage.com of its costs and expenses of this action, including attorneys' fees under 28 U.S.C. § 2412(b); and

D.     Such other and further relief as the Court deems just and proper.

DATED:  December 11, 2015.

By:      /s/ Robert Corn-Revere
         Robert Corn-Revere (DC Bar #375415)
         bobcornrevere@dwt.com
         Ronald G. London (DC Bar #456284)
         ronnielondon@dwt.com
         Lisa B. Zycherman (DC Bar #495277)
         lisazycherman@dwt.com
         DAVIS WRIGHT TREMAINE LLP
         1919 Pennsylvania Ave., N.W., Suite 800
         Washington, D.C. 20006
         Telephone:  (202) 973-4200

James C. Grant
(*pro hac vice* application to be filed)
jimgrant@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone:  (206) 622-3150

Counsel for Plaintiff