# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BACKPAGE.COM, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.  1:15-cv-2155-RBW |
| | ) |
| LORETTA E. LYNCH, in her official | ) |
| capacity as Attorney General of the | ) |
| United States of America, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## OPPOSITION TO MOTION TO DISMISS

Robert Corn-Revere (DC Bar #375415)
bobcornrevere@dwt.com
Ronald G. London (DC Bar #456284)
ronnielondon@dwt.com
Lisa B. Zycherman (DC Bar #495277)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Telephone:  (202) 973-4200

James C. Grant (*pro hac vice*)
jimgrant@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone:  (206) 622-3150

Counsel for Plaintiff

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    Backpage and Efforts to Restrict Online Classified Websites ................................. 3

    B.    State Legislation ......................................................................................... 5

    C.    Legislative History of the SAVE Act ...................................................... 6

STANDARD OF REVIEW .............................................................................................. 9

ARGUMENT ................................................................................................................. 10

I.    BACKPAGE HAS STANDING TO CHALLENGE THE SAVE ACT ......................... 11

    A.    The Complaint's Allegations Establish a Credible Threat of Prosecution to Backpage.com ..................................................................... 12

    B.    The SAVE Act's Sponsors Specifically Targeted Backpage .............................. 17

II.    THE SAVE ACT'S ADDITION OF "ADVERTISING" VIOLATIONS RENDER § 1591 UNCONSTITUTIONALLY VAGUE AND OVERBROAD ............................. 20

    A.    The First Amendment Requires Precise Legislative Drafting .............................. 20

    B.    The SAVE Act Amendments Create Ambiguity in § 1591 ................................. 22

    C.    The Government's Interpretation of the SAVE Act Confirms its Ambiguity ...... 26

III.    THE SAVE ACT AMENDMENTS TO § 1591'S *MENS REA* PROVISION RENDER IT UNCONSTITUTIONAL ........................................................................... 27

    A.    The Save Act Creates an Indeterminate *Mens Rea* Standard ............................. 28

    B.    Speech Restrictions Require Heightened *Mens Rea* ........................................... 30

IV.    THE SAVE ACT CREATES A DE FACTO NOTICE-AND-TAKEDOWN REGIME THAT AMOUNTS TO A HECKLER'S VETO ............................................ 32

    A.    The Threat of Liability for Speech for Online Platforms Creates a Heckler's Veto ................................................................................................. 33

B.     DOJ Admits Self-Censorship is the Safest Response to the SAVE Act ............... 35

V.     A DECLARATORY JUDGMENT SHOULD ISSUE EVEN IF THE COURT
       ACCEPTS THE ATTORNEY GENERAL'S READING OF § 1591 ............................ 36

CONCLUSION .......................................................................................................................... 37

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Reno*,
    31 F. Supp. 2d 473 (E.D. Pa. 1999) ..............................................................16, 17

*ACLU v. Reno*,
    929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997)..............................................36

*Act Now to Stop War & End Racism Coalition v. Dist. of Columbia*,
    905 F. Supp. 2d 317 (D.D.C. 2012) ..........................................................................20, 21, 24

*American Library Ass'n v. Barr*,
    956 F.2d 1178 (D.C. Cir. 1992) ..............................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................9

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)........................................................................ *passim*

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013)......................................................... *passim*

*Backpage.com, LLC v. Cooper*,
    2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013) ....................................................6

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ...................................................................2, 13, 34

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 23, 2013) .................................................. *passim*

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012).................................................... *passim*

*Bauer v. Shepard*,
    620 F.3d 704 (7th Cir. 2010) ..............................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................9, 20

*Bible Believers v. Wayne Cnty.*,
    805 F.3d 228 (6th Cir. 2015) ..............................................................................33

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ..................................................................................................13

*Brown v. Entertainment Merchants Ass'n,*
    131 S. Ct. 2729 (2011) ...................................................................................10, 20, 21

*Brown v. Louisiana,*
    383 U.S. 131 (1966) ..................................................................................................33

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .....................................................................................................21

*Chamber of Commerce v. FEC,*
    69 F.3d 600 (D.C. Cir. 1995) ...................................................................................17

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ...................................................................................................24

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) .................................................................................................25

*Dart v. Craigslist, Inc.,*
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ....................................................................2, 4

*Dhiab v. Obama,*
    70 F. Supp. 3d 486, 500 (D.D.C. 2014) ...................................................................33

*Doe v. Backpage.com, LLC,*
    ---F.3d ---, 2016 WL 963848 (1st Cir. Mar. 14, 2016) ................................2, 13, 26

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965) .................................................................................................13

*EEOC v. Catastrophe Mgmt. Sols.,*
    11 F. Supp. 3d 1139, 1141 (S.D. Ala. 2014) ...........................................................33

*EEOC v. St. Francis Xavier Parochial Sch.,*
    117 F.3d 621 (D.C. Cir. 1997) ...................................................................................9

*Elonis v. United States,*
    135 S. Ct. 2001 (2015) .......................................................................................30, 31

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .......................................................................................20, 21, 25

*Herbert v. Nat'l Academy of Sciences,*
    974 F.2d 192 (D.C. Cir. 1992) .................................................................................14

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*,
    338 F.3d 1024 (D.C. Cir. 2003) ........................................................................9, 14

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ...............................................................................9

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ......................................................................................22, 25

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) .......................................................................27, 33, 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................12

*Meizer v. Bd. of Educ.*,
    336 F.3d 185 (2d Cir. 2003) ....................................................................................33

*Munroe v. Central Bucks Sch. Dist.*,
    805 F.3d 454 (3d Cir. 2015) ....................................................................................33

*N.H. Right to Life Pol. Action Comm. v. Gardner*,
    99 F.3d 8 (1st Cir. 1996) ...................................................................................16, 17

*NAACP v. Button*,
    371 U.S. 415 (1963) ...........................................................................................21, 22

*Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*,
    670 F. Supp. 424 (D.D.C. 1987) .............................................................................37

*News America Publishing, Inc. v. FCC*,
    844 F.2d 800 (D.C. Cir. 1988) ...............................................................................18

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980) ...............................................................................37

*Reno v. ACLU*,
    521 U.S. 844 (1997) ....................................................................................... *passim*

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2010) ...................................................................................33

*Roe v. Aware Woman Center for Choice, Inc.*,
    253 F.3d 678 (11th Cir. 2001) .................................................................................33

*Shaffer v. Defense Intel. Agency*,
    601 F. Supp. 2d 16 (D.D.C. 2009) ...........................................................................9

*Simon v. Eastern Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)...................................................................................12

*Skilling v. United States*,
    561 U.S. 358 (2010)...............................................................................23

*Smith v. California*,
    361 U.S. 147 (1959)...........................................................................30, 31

*Smith v. Goguen*,
    415 U.S. 566 (1974)...............................................................................23

*Steffel v. Thompson*,
    415 U.S. 452 (1974)...............................................................................13

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014)................................................................. *passim*

*Thomas v. United States*,
    696 F. Supp. 702 (D.D.C. 1988) ..........................................................21

*United States v. Alvarez*,
    617 F.3d 1198 (9th Cir. 2010) ..............................................................22

*United States v. Bronstein*,
    --- F. Supp. 3d ---, 2015 WL 9412106 (D.D.C. Dec. 22, 2105) ..................................... *passim*

*United States v. Hsia*,
    24 F. Supp. 2d 33 (D.D.C. 1998) ..........................................................21

*United States v. L. Cohen Grocery Co.*,
    255 U.S. 81 (1921)..................................................................................25

*United States v. Lustig*,
    3 F. Supp. 3d 808 (S.D. Cal. 2014)..........................................................1

*United States v. Scanio*,
    705 F. Supp. 768 (W.D.N.Y. 1988) ......................................................32

*United States v. Stevens*,
    559 U.S. 460 (2010).............................................................................2, 36

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994)..............................................................................30, 31

*Universal Commc'ns Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007)..................................................................26

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988)..........................................................................................12, 15, 17

*Z Street, Inc. v. Koskinen,*
    44 F. Supp. 3d 48, 54 (D.D.C. 2014) ...........................................................................9

*Zeran v. America Online, Inc.,*
    129 F.3d 327 (7th Cir. 1997) .......................................................................................34

**Constitutional Provisions**

U.S. Const., amend. I .................................................................................... *passim*

U.S. Const., amend. V.........................................................................................21

**Statutes**

18 U.S.C. § 1591 ............................................................................................ *passim*

18 U.S.C. § 1595 .......................................................................................................36

47 U.S.C. § 230.............................................................................................. *passim*

Pub. L. No. 114-22, § 118, 129 Stat. 227 (2015)......................................................1

Wash. Rev. Code § 9.68A.104..................................................................................5

**Rules**

Fed. R. Civ. P. 8......................................................................................................32, 33

Fed. R. Civ. P. 12(b) ...................................................................................1, 9, 20, 38

**Legislative Material**

160 Cong. Rec. H4516 (daily ed. May 20, 2014) ......................................................8

160 Cong. Rec. H4518-19 (daily ed. May 20, 2014).................................................19

160 Cong. Rec. H4521 (daily ed. May 20, 2014) .....................................................19

160 Cong. Rec. S1458 (daily ed. Mar. 12, 2015) .................................................18, 30

161 Cong. Rec. H599 (daily ed. Jan. 27, 2015) ....................................................7, 28

161 Cong. Rec. H600 (daily ed. Jan. 27, 2015) .......................................................28

161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015) .................................................8, 17, 30

161 Cong. Rec. S1622 (daily ed. Mar. 18, 2015) ....................................................8, 19

*Organizational Meeting, etc.*, 114th Cong. 77 (Jan. 21, 2015) ....................................................29

**Other Authorities**

*Human Trafficking*, Sen. Dianne Feinstein, Letter to the Editor, N.Y. Times,
    Mar. 16, 2016 ..........................................................................................................3, 8, 19, 22

Plaintiff Backpage.com, LLC ("Backpage") hereby opposes the motion of the Defendant Attorney General to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  The Motion to Dismiss should be denied because Backpage has standing to bring this action, and its Complaint states an important claim upon which relief can and should be granted.

## INTRODUCTION

The government seeks dismissal of this case arguing that the Plaintiff has misinterpreted the Stop Advertising Victims of Exploitation Act of 2015 (the "SAVE Act"), Pub. L. No. 114-22, § 118, 129 Stat. 227 (2015).  It claims Backpage is not at risk of being prosecuted – and even lacks standing to bring a pre-enforcement challenge – because the SAVE Act's statutory prohibition on "advertising," although undefined, is "easily understood by ordinary people based on its dictionary definition," and because prosecutions under § 1591(a)(1)-(2) require proof of "knowing scienter."  Memorandum in Support of Defendant's Motion to Dismiss ("Def. Mem.") 2.  If the terms and effect of the SAVE Act amendment were so clear, it would not have been necessary to file this suit.

What is clear is that sponsors and supporters of the SAVE Act have stated that it targets websites such as Backpage that do not author or post ads but only host them.  If the Department of Justice ("DOJ") simply wanted to pursue persons who actually and knowingly place ads to commit sex trafficking, no change would have been required in the prior law, 18 U.S.C. § 1591.  *See*, *e.g.*, *United States v. Lustig*, 3 F. Supp. 3d 808 (S.D. Cal. 2014).  The SAVE Act amendments only confused the scope of § 1591 and the level of culpability required to establish a violation, and did so in a way that puts online intermediaries and other publishers at risk.

The SAVE Act is the culmination of years of politically charged, extra-legal efforts by some to shutter adult services sections of online classified ad websites.  *See* Compl. ¶¶ 19-26.  It

made no difference to the chief proponents of the law that these websites hosted only third-party content, engaged in extensive screening to prevent illegitimate use, or cooperated with law enforcement. *Id*. ¶¶ 15-18. Nor did it matter that the national policy previously established by Congress encourages self-policing by online intermediaries, or that numerous courts had confirmed the activities of Backpage.com and similar websites are protected by the First Amendment. *See* 47 U.S.C. § 230; *Doe v. Backpage.com, LLC*, ---F.3d ---, 2016 WL 963848, at *5-7 (1st Cir. Mar. 14, 2016); *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009). *See also* Compl. ¶¶ 24-26. Regardless of these facts, the SAVE Act sponsors made clear their intention to target Backpage through repeated resolutions, letters, floor statements and press releases. *Id*. ¶¶ 51-55. And they crafted a piece of legislation, adding undefined terms and incorporating last-minute changes, to allow this very result. *Id*. ¶¶ 27-50. DOJ's motion mentions none of this.

Instead, DOJ argues this pre-enforcement challenge should be dismissed for lack of standing, claiming "there is no reason to assume that the Government would initiate a prosecution." Def. Mem. 23 n.6. This flies in the face of established law that one need not risk prosecution to bring a facial challenge, and that the First Amendment "does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). The government acknowledges the dictionary definition of the term "advertise" is sufficiently expansive to include web platforms that do not provide their own content, while ignoring last-minute SAVE Act amendments that undermine both the *mens rea* standard and DOJ's current strategic reassurances. Ultimately, DOJ admits the SAVE Act effectively imposes a notice-and-takedown regime, when it asserts that avoiding possible prosecution is simple: If any given post raises

questions, just "remove the ad."  Def. Mem. 23 n.6.  This is the very definition of a "heckler's veto."

The SAVE Act's sponsors reiterated their intent to "get" Backpage.com even ***after*** DOJ submitted its motion claiming that Backpage's concerns about the law are imagined.  Senator Dianne Feinstein wrote to the *New York Times* on March 16, 2016 that she and co-sponsor Senator Mark Kirk offered the legislation to ensure "the Justice Department has the authority to prosecute owners of these websites" – naming Backpage.com specifically – and that she has "strongly urged the department to act."  *Human Trafficking*, Sen. Dianne Feinstein, Letter to the Editor, N.Y. Times, Mar. 16, 2016, at A22 ("Feinstein *Human Trafficking* Letter").  A declaratory ruling is necessary to clarify the law and to avoid these chilling effects.

## BACKGROUND

The facts relevant to this action as alleged in the Complaint, which the Court must accept as true in deciding the government's motion, are as follows.

### A.      Backpage and Efforts to Restrict Online Classified Websites

Backpage, an online classified advertising service located at www.backpage.com, was launched in 2004 and serves all fifty states and the District of Columbia.  Users of Backpage may post ads in a number of categories (*e.g.*, local places, buy/sell/trade, automotive, rentals, real estate, jobs, dating, adult and services) and various subcategories.  Users post millions of ads every month.  Backpage is the second-largest classified ad website in the United States, after Craigslist.  Compl. ¶¶ 15-16.

Users provide all content for their ads on Backpage, including all text, titles, and photographs.  Backpage does not dictate any content, although it does screen, block and remove ads that violate the website's terms of use.  Backpage prohibits illegal content and activity on its

website and takes numerous steps to prevent such misuse, especially to guard against any human trafficking or child exploitation.  Backpage has voluntarily employed extensive monitoring to identify improper content, including automated filtering and manual review.  It also reports suspect ads to the National Center for Missing and Exploited Children ("NCMEC"), and regularly works with local, state and federal law enforcement to support investigations and prosecutions.  These actions include promptly responding to subpoenas, providing training to law enforcement, removing and blocking posts at their request, and even conducting independent research to assist in rescuing victims and the arrest and prosecution of criminals.  *Id.* ¶¶ 17-18.

From 2007-2010, many public officials pressured the online classified ad website Craigslist to eliminate its category for adult services ads.  For example, the Sheriff of Cook County, Illinois sued Craigslist in 2009, claiming that such ads constituted a public nuisance. That case was dismissed on the pleadings, and the court held Craigslist was immune from liability for third-party content under the safe harbor provisions of the Communications Decency Act ("CDA"), *codified at* 47 U.S.C. § 230 ("Section 230").  *Dart v. Craigslist*, 665 F. Supp. 2d 961.  As that court stated, online services do not "cause" postings except "'in the sense of providing a place where people can post'" (citation omitted), they "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts," and having an adult services category "is not unlawful in itself nor does it necessarily call for unlawful content." *Id.* at 966, 967-69.

In the same period, a group of seventeen state attorneys general pressured Craigslist to eliminate adult-oriented ads on its website.  In September 2010, Craigslist succumbed and removed its adult services category.  Shortly thereafter, the state attorneys general targeted Back-page with similar demands.  Other public officials, including U.S. senators and representatives

(and, in particular, the SAVE Act's sponsors) have since joined in the call for censorship.  For example, on March 23, 2012, nineteen senators wrote Village Voice Media (parent company of Backpage at the time) to demand that it "remove the adult services section of Backpage.com."  Similarly, on October 5, 2012, six U.S. senators wrote to the company that acquired Village Voice Media's print publications, threatening to continue to hold it "accountable" until "shutting down Backpage's 'adult entertainment' section … has been achieved."  Compl. ¶¶ 20-21.

The pressure has taken the form of more formal legislative demands as well.  On May 10, 2012, the House of Representatives passed House Resolution 649 targeting Backpage.com and "call[ing] on all Internet media providers to immediately eliminate 'adult entertainment' sections and [similar] classified advertising."  On December 21, 2012, the U.S. Senate passed Senate Resolution 439 demanding the "eliminat[ion] of the 'adult entertainment' section of the classified advertising website Backpage.com."  *Id*. ¶ 21.

## B.      State Legislation

In 2012, three states passed laws creating felony offenses expressly targeting Backpage.com.  *See, e.g.*, Wash. Rev. Code § 9.68A.104 (offense in since-repealed statute entitled "advertising commercial sexual abuse of a minor").  In each instance, federal courts enjoined the laws, finding them unconstitutional under the First Amendment and preempted by Section 230.  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 23, 2013).

The decisions reaffirmed that advertisements for adult services and personals ads are legally and constitutionally protected, as are the websites that host such content.  For example, the courts noted that escort ads have long been permitted (and escort services are licensed and

regulated in many states), and that the states' efforts to regulate or effectively block such ads "will likely chill protected speech."  *McKenna*, 881 F. Supp. 2d at 1282.  The courts rejected arguments that the laws prohibited only advertisements for illegal transactions and instead found they were overbroad and could not survive strict scrutiny.  *Hoffman*, 2013 WL 4502097, at *8. As the federal district court in Tennessee summarized:

> Child sexual exploitation is an evil that states have an undisputed interest in dispelling.  However despicable this evil, though, the Constitution stands as a shield against broad assaults by states on the rights of their citizens.  The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix.

*Cooper*, 939 F. Supp. 2d at 813.  In all three cases, the courts ultimately entered permanent injunctions and awarded Backpage attorneys' fees.  *See*, *e.g.*, *Backpage.com, LLC v. Cooper*, 2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013).

### C.    Legislative History of the SAVE Act

The SAVE Act amendments to § 1591 resulted from these same state and federal efforts to target online classified advertising websites.  The legislative push to amend the federal law began in the 113th Congress and culminated in President Obama signing the bill on May 29, 2015.  Compl. ¶¶ 27-50.  In its motion, DOJ describes the statutory background of the Trafficking Victims Protection Act (which includes § 1591), *see* Def. Memo. 3-5, but devotes only three sentences to the SAVE Act amendments that are at issue in this case:  the addition of advertising to the list of prohibited acts in § 1591(a)(1), and the amended *mens rea* requirement providing that the prohibitions of § 1591(a) apply "where someone acts 'knowing, or, *except where the act constituting the violation of paragraph (1) is advertising*, in reckless disregard of the fact,' that force, fraud, or coercion will be used or that the individual involved is a minor." Def. Mem. 5 (quoting § 1591(b)(2)) (emphasis DOJ's).

The government's abbreviated recitation explains neither the context in which the SAVE Act arose, nor how its specific provisions evolved.   By contrast, the Complaint describes the legislative proposals that culminated in the SAVE Act.   Compl. ¶¶ 27-50.   They focused on adding advertising or its distribution to § 1591's prohibitions, and on the level of *mens rea* that should be required to establish a violation.   *Id*. ¶¶ 29-48.   While the sundry bills did not define the terms "advertising" or "advertises," significant discussion about earlier drafts emphasized the need to ensure liability attached only for "knowing" violations – when the defendant had actual knowledge the victim was a minor or was subject to force, fraud or coercion.   *Id*. ¶¶ 31-35, 40.   As Representative Blake Farenthold explained the concern:   "I want the legislative history of this bill to show that 'knowingly' is important;" the bill was "carefully crafted" so that "Internet companies and legitimate Web sites are protected" unless "[t]hey … know that they are advertising for victims of human trafficking."   161 Cong. Rec. H599 (daily ed. Jan. 27, 2015).

However, this concern about the *mens rea* standard in earlier proposals went missing by the time the final bill was introduced and passed.   The measure eventually adopted as the SAVE Act was introduced in the 114th Congress as S.178, the "Justice for Victims of Trafficking Act."   Compl. ¶ 44.   Shortly thereafter, Senator Kirk proposed an amendment to S.178 (called the "SAVE Act," like earlier legislation he had sponsored).   *Id*. ¶ 45.   When the amendment was introduced for consideration by the Senate, the language of the proposed *mens rea* standard had been modified.   Under the revised language, a person who places an advertisement is subject to a "knowing" standard, but one who "benefits, financially, or by receiving anything of value, from participation in a venture" where the predicate act is advertising is subject to a "reckless disregard" standard of *mens rea*.   This change was made without discussion, debate, or referral to

committee, and this version of the bill with the altered *mens rea* standard was signed into law. *Id*. ¶¶ 46-50.

The SAVE Act sponsors and other legislators made unambiguous statements about their purpose, although DOJ in its motion mentions none of this.  As Senator Kirk explained, "I intended to go after Backpage.com ….  We really ought to be able to charge them."  161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015).  *See* Compl. ¶ 28.  His co-sponsor, Senator Feinstein, added that "there are Internet companies that are profiting [and] [t]his must stop."  The Act thus "imposes liability on Web sites that know that their sites are being used to advertise minors for sex."  161 Cong. Rec. S1622 (daily ed. Mar. 18, 2015).  She has said repeatedly that the purpose of the SAVE Act is to prosecute Backpage.  Feinstein *Human Trafficking* Letter, *supra*. Likewise, Representative Wagner described the legislative purpose as "end[ing] facilitation of sex trafficking by Web sites like Backpage and others."  160 Cong. Rec. H4516 (daily ed. May 20, 2014).  *See* Compl. ¶ 53.

After enactment of the SAVE Act – and even after DOJ filed its motion – the SAVE Act's sponsors have repeated their views that the Act is intended to target Backpage.  In addition to Senator Feinstein's March 16, 2016 statements to the NEW YORK TIMES in which she "strongly urged" DOJ to prosecute Backpage under the SAVE Act, *see* Feinstein *Human Trafficking* Letter, *supra*, Senator Kirk has "repeatedly called on the Justice Department to investigate Backpage and enforce my SAVE Act."  *See*  http://www.kirk.senate.gov/ ?p=press_release&id=1692.

**STANDARD OF REVIEW**

In assessing a plaintiff's standing and the court's jurisdiction to hear a case under Rule 12(b)(1), the Court "must assume that [the plaintiff] states a valid legal claim," "accept the factual allegations in the complaint as true,'" and may consider matters outside the pleadings. *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003); *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005). To withstand a motion to dismiss, the "plaintiff need only plead 'enough facts to state a claim to relief that is plausible on its face' and to 'nudge [its] claims across the line from conceivable to plausible." *Shaffer v. Defense Intel. Agency*, 601 F. Supp. 2d 16, 22 (D.D.C. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Under Rule 12(b)(6), a complaint must simply contain sufficient facts, accepted as true, to state a claim to relief that is "plausible on its face," which "is not akin to a 'probability requirement,'" but only requires "more than a sheer possibility" that the plaintiff can prevail. *Z Street, Inc. v. Koskinen*, 44 F. Supp. 3d 48, 54 (D.D.C. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted), *aff'd*, 791 F.3d 24 (2015). A plaintiff can survive a Rule 12(b)(6) motion "even where recovery is very remote," so long as the facts alleged "raise [the] right to relief above the speculative level," *id.* (quoting *Twombly*, 550 U.S. at 555-56) (internal quotation marks omitted), an assessment in which the Court may consider "'facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice.'" *Id.* at 54-55 (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## ARGUMENT

Backpage's standing to challenge a federal law that was designed to provide a means to prosecute the website cannot seriously be questioned.  The SAVE Act was adopted following years of efforts to shut down online adult-oriented classified advertising (and many of these efforts were held to be unconstitutional), and its sponsors were – and continue to be – candid about their purpose to shut down Backpage.com.  DOJ raises no new arguments in its standing challenge, and the same arguments were rejected in the cases that struck down state laws that similarly targeted Backpage.  The Supreme Court recently reaffirmed standing to bring such a pre-enforcement challenge in *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014).  DOJ simply misreads that case.  Where, as here, the law's sponsors were emphatic about their purpose to target Backpage, the government's standing argument borders on the frivolous.

On the merits, DOJ admits the new criminal proscription for "advertising" added by the SAVE Act is undefined but asserts that it is not an "exotic term of art" and is "easily understood." Def. Mem. 17.  But this fails the requirement that the "government may regulate in the area of First Amendment freedoms only with narrow specificity," *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2743 (2011) (internal quotation marks omitted), and is undermined by the government's reference to online dictionary definitions as the basis for its interpretation.  Any pretense of precise legislative drafting is belied by DOJ's assertion that the SAVE Act could be extended to web hosts of third party content if they so much as "influence" the information posted by others.  These arguments only underscore the SAVE Act's vagueness.

The law's ambiguity is compounded by the indeterminate *mens rea* standard adopted in the last-minute amendment to the bill.  DOJ argues that § 1591 "sets forth a 'knowing' *mens rea* requirement where the underlying act is advertising," Def. Mem. 2, but ignores the specific

change that altered the *mens rea* requirement.  The eleventh-hour change stripped away the clarity of prior drafts that a publisher or other defendant could not be liable under § 1591(a)(2) for benefiting financially from advertising except upon proof that it had knowledge the advertising was for sex trafficking and knowingly participated in a venture to bring about the trafficking.  The amended final language (by its most logical reading) instead directed that a "knowing" *mens rea* standard is required to convict an individual who posts an advertisement, but reckless disregard is sufficient to prove an offense against a party that benefits financially from the advertising.  This reverses and subverts established constitutional protections for distributors of speech, such as websites and other publishers.

The cumulative effect of the altered *mens rea* standard, given how it came about, is to underscore the ambiguity of the SAVE Act and impose a *de facto* notice-and-takedown regime.  DOJ quibbles about whether this "heckler's veto" is a stand-alone claim despite the Supreme Court's decision in *Reno v. ACLU*, 521 U.S. 844 (1997), but admits that if there is doubt about any particular ad, the only safe course is to delete it.  The First Amendment does not permit the government to place its thumb on the scale in favor of censorship.  Consequently, DOJ cannot show the claims asserted here are implausible, and its motion to dismiss must be denied.

## I.   BACKPAGE HAS STANDING TO CHALLENGE THE SAVE ACT

Backpage has standing to challenge the SAVE Act amendments to § 1591 because there is a "credible threat of prosecution" that more than satisfies the injury-in-fact requirement of Article III.  DOJ argues that Backpage lacks standing because it does not claim responsibility for advertisements on the website that might be illegal, and ads that are for sex trafficking would not be protected speech under the First Amendment.  Thus, the argument goes, because the SAVE Act requires proof of a "knowing" *mens rea* in some fashion*,* there is no credible threat of

prosecution for any constitutionally-protected speech.  Def. Mem. 1, 9-13.  If the government's novel theory of standing were correct, it would be impossible to bring a pre-enforcement challenge without first confessing a violation of the law – which would then be disqualifying because the speech would lack constitutional protection.

DOJ's circular argument hinges entirely on whether the government is correct on the merits – which is not a valid basis for denying standing.  *See*, *e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988).  It fundamentally misreads the law of standing – in particular *Driehaus*, which reaffirmed the principle that "nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."   134 S. Ct. at 2345.   Moreover, in this case, the government's claim that Backpage has not alleged a credible threat of enforcement rings especially hollow in light of the many statements by SAVE Act sponsors and proponents that the purpose of the law was to "go after" Backpage, even though the legislators were quite aware that the website neither authors nor posts content.

### A.    The Complaint's Allegations Establish a Credible Threat of Prosecution to Backpage.com

The  standard  here  is  that  Backpage  must  allege  injury-in-fact  "fairly  traceable  to  the defendant's allegedly unlawful conduct" that is "likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976)) (alterations omitted); *Driehaus*, 134 S. Ct. at 2341. Backpage satisfied this requirement by alleging an "intention to engage in a course of conduct arguably affected with a constitutional interest" and showing a credible threat of prosecution. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  In the context of a First

Amendment challenge such as this, showing "a threat of specific future harm," *Bigelow v. Virginia,* 421 U.S. 809, 816-17 (1975), does not require Backpage to "first expose [it]self to actual arrest or prosecution to be entitled to challenge a statute [it] claims deters the exercise of … constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  DOJ's argument that Backpage only risks prosecution if it intends to knowingly post illegal ads is preposterous. Standing is established where the plaintiff's fear of prosecution is not "imaginary or wholly speculative." *Driehaus*, 134 S. Ct. at 2343; *Babbitt*, 442 U.S. at 302; *see Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965) ("[T]hose affected by a statute are entitled to be free of the burdens of defending prosecutions, however expeditious, aimed at hammering out the structure of the statute piecemeal.").

There is no question but that Backpage intends "to engage in a course of conduct arguably affected with a constitutional interest." *Babbitt,* 442 U.S. at 298.  It hosts an online classified ad service and intends to continue providing that forum for third parties' speech. Compl. ¶¶ 15-18.  Several courts have held that hosting advertisements – including adult-oriented and escort ads – is protected by the First Amendment.  *See*, *e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d at 234-35 (suppression of Backpage.com violates the First Amendment); *Cooper*, 939 F. Supp. 2d at 831-33 (Tennessee law criminalizing online adult advertising "encompasse[d] vast swaths of legal, consensual, non-commercial sexual activity" ); *McKenna*, 881 F. Supp. 2d at 1281-82 (hosting third-party speech online is protected by the First Amendment and govern-ment regulation cannot be vague or overly broad); *Hoffman*, 2013 WL 4502097, at *8-10 (same); *cf. Doe v. Backpage.com*, 2016 WL 963848, at *5-6 (Backpage's activities that are "part and parcel of the overall design and operation of the website" are indistinguishable from traditional

editorial or publishing functions and immune under Section 230 protections intended to foster free speech online).

DOJ concedes that Backpage may have a constitutionally-protected interest in general, but asserts Backpage nonetheless lacks standing because this interest is unaffected by the SAVE Act amendments. This is so, the government claims, because § 1591 targets only ads for illegal acts which are unprotected. Def. Mem 10. And, because the Complaint alleges these ads are attributable to third parties, not Backpage, DOJ claims § 1591 cannot reach *Backpage's* speech. Thus, it concludes, "any conduct by [Backpage] arguably affected with a constitutional interest is not the conduct … proscribed." *Id*. 11-12 (quoting *Driehaus*, 134 S. Ct. at 2342). But DOJ's argument begs the question – whether the SAVE Act regulates speech with the level of precision and scienter the First Amendment requires, so that websites such as Backpage and other publishers can have assurance they cannot be prosecuted or found criminally liable merely for hosting or distributing content. If it does not, then Backpage's constitutionally-protected service as an online intermediary is at risk, and standing is undisputable.

At the motion to dismiss stage, "a plaintiff's non-frivolous contention regarding the meaning of a statute ***must be taken as correct*** for purposes of standing." *Info. Handling Servs.*, 338 F.3d at 1030 (emphasis added). And where jurisdictional issues of standing and the merits are intertwined, the Court should assume jurisdiction in order to address the ultimate issues. *Id.*; *see also Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). Allowing standing for a pre-enforcement challenge is especially important in the First Amendment context where a "'law is aimed directly at the plaintiffs, who, if their interpretation of the statute is

correct,'" will have to take steps to comply "'or risk criminal prosecution." *Cooper*, 939 F. Supp. 2d at 819 (quoting *Am. Booksellers Ass'n*, 484 U.S. at 392).[1]

DOJ's arguments about the meaning of the statute actually underscore Backpage's standing. The government argues that Backpage "does not suggest … ambiguity [as to] *which advertisements* would be … related to sex trafficking," but rather "only … *who* may be charged … as one who 'advertises' … and what *mens rea* is required[.]" Def. Mem. 11. But that is entirely the point – the statute is vague regarding whether Backpage or the third parties who post content may be prosecuted (or both), and what scienter is required. As explained below, DOJ even admits the only sure way to avoid doubt or possible prosecution is to "remove the ad[s]." Def. Mem. 23 n.6. Standing unquestionably is established where such uncertainty and the threat of criminal prosecution will force a website operator to review and block third party content. *McKenna*, 881 F. Supp. 2d at 1270.

This is why several courts have rejected nearly identical standing arguments when Backpage challenged state laws that targeted online classified advertising sites. *See id.* at 1269-70. In particular, the court in *Cooper* rejected Tennessee's standing argument that Backpage "would be unlikely to face prosecution" because it "has not alleged that it intends to violate the law" and takes measures "to screen illicit ads." 939 F. Supp. 2d at 818. These courts applied settled law that a plaintiff has standing to bring a pre-enforcement challenge to a law that regulates speech even though it has no intention of violating the law. *Driehaus*, 134 S. Ct. at

---

[1] The same problem undermines DOJ's effort to claim that Backpage fails to allege a credible threat of prosecution in challenging § 1591's amended *mens rea* standard. Def. Mem. 13-14. The government argues that Backpage "misconstrues the mens rea applicable to advertising-related charges" under § 1591. *Id.* 13. This argument likewise turns on an analysis of the merits of Backpage's claim concerning the ambiguity of the SAVE Act's terms.

2345; *see Babbitt*, 442 U.S. at 301 (standing found even though plaintiffs disavowed any intent to "propagate untruths").

In a footnote, DOJ asserts that the standing analysis in *Cooper* and *McKenna* does not apply here because those cases preceded the Supreme Court's decision in *Driehaus*, which "made clear that, even in the pre-criminal enforcement context, there remains a separate requirement that the conduct at issue be 'arguably affected with a constitutional interest.'" Def. Mem. 13 n.2 (quoting *Driehaus*, 134 S. Ct. at 2343). But that requirement comes directly from *Babbitt* (which the Court quoted in *Driehaus* for that point, *see* 134 S. Ct. at 2342-43), and is thus hardly new law. DOJ also cites *American Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), to support its contention that Backpage lacks standing, Def. Mem. 11-12, but that case is entirely distinguishable, in that the law in question was not "aimed directly" at the plaintiffs in the way that the SAVE Act targets Backpage. *Barr*, 956 F.2d at 1194. Nor did the law at issue there suffer from the ambiguities that plague the SAVE Act, because it specifically defined what expression was subject to regulation, and the plaintiffs made no claim that they were chilled from producing such speech. *Id.* at 1192.

Ultimately, "'[t]he standard – encapsulated in the phrase 'credible threat of prosecution' – is quite forgiving." *ACLU v. Reno*, 31 F. Supp. 2d 473, 479 (E.D. Pa. 1999) (quoting *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996), and citing *Babbitt*, 442 U.S. at 298)). As the *ACLU v. Reno* district court held, in a case that similarly involved a pre-enforcement challenge to a law targeting online expression:

> Supreme Court precedent and federal appellate court decisions … "make clear that when dealing with pre-enforcement challenges to recently enacted … statutes that facially restrict expressive activity by the class to which the plaintiff belongs, the court will assume a credible threat of prosecution in the absence of compelling contrary evidence."

*Id.* (quoting *Gardner*, and citing *Babbitt*, *Am. Booksellers*, and *Chamber of Commerce v. FEC*, 69 F.3d 600, 603-04 (D.C. Cir. 1995)).  In this case, the SAVE Act unquestionably puts websites like Backpage and other publishers at risk.

It is also significant that, while DOJ asserts Backpage has no reason to fear criminal liability under the SAVE Act, it does not disavow that it will pursue Backpage under the law. DOJ instead defends the SAVE Act amendments vigorously, and insists "there are certainly instances" where Backpage may be susceptible to prosecution, including if it merely "influences" the content of ads that it publishes – whatever that may mean.  *See* Def. Mem. 18-19.  But the government cannot have it both ways.  When it "has not disavowed any intention" of enforcing a challenged law against a party, that party is "not without some reason in fearing prosecution."  *Babbitt*, 442 U.S. at 302; *see also Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("existence of a statute implies a threat to prosecute").  Backpage thus faces a credible threat from enforcement of § 1591 as amended by the SAVE Act, and thus has standing to challenge the Act.

### B.    The SAVE Act's Sponsors Specifically Targeted Backpage

As the Complaint sets forth in detail, the SAVE Act's legislative history is rife with statements that its sponsors and supporters "intended to go after Backpage.com."  *See* Compl. ¶ 28 (quoting 161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015) (statements of Sen. Kirk)); *see also id.*  ¶¶ 27-55.  DOJ is strangely silent on this point despite the fact that injury-in-fact is "*automatically* met, if 'the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct," are placed at risk of criminal prosecution.  *Cooper*, 939 F. Supp. 2d at 819 (quoting *Am. Booksellers Ass'n*, 484 U.S. at 392 (emphasis added)).

Legislative statements obviously are relevant to determine congressional intent and to the question of standing.[2]  In *News America Publishing, Inc. v. FCC*, 844 F.2d 800, 809-10 (D.C. Cir. 1988), the D.C. Circuit examined legislative history and congressional statements made both before and after enactment of an appropriation measure to determine whether seemingly neutral language in the measure was used to target a particular publisher and reflected "censorial intent." Where legislators' statements demonstrate that a given speaker was targeted "with the precision of a laser beam," this raises concerns similar to those underlying the constitutional proscription against Bills of Attainder.  *Id*. at 813-14.  But it is not necessary to go that far, because, when the legislative record reveals a focus on a closed class of speakers, reviewing courts may use congressional statements to help decipher what Congress had in mind.  *Id*. at 806-09 (reviewing numerous pre- and post-enactment remarks).

Here, there is no mystery – the manifest purpose of the SAVE Act to target Backpage could not be clearer.  Senator Kirk emphasized that the legislation sought to reach Backpage's activity as an online intermediary ***in particular***, citing and apparently seeking to evade the immunity accorded to websites for third-party content under Section 230.  160 Cong. Rec. S1458 (daily ed. Mar. 12, 2015) (referencing the CDA and stating: "We should thread the needle very carefully when it comes to … backpage.com.").  Regarding an earlier version of the SAVE Act, Representative Wagner likewise urged that "government intervention is necessary" specifically to target Backpage, and stated that the SAVE Act "seeks to criminalize this behavior."  160

---

[2] For example, the *Cooper* court held Backpage had standing for its pre-enforcement challenge to Tennessee's law "that 'legislators openly stated was aimed at Backpage.com." 939 F. Supp. 2d at 819 (quoting *McKenna*, 881 F. Supp. 2d at 1270-71) (internal ellipses omitted). And both *Cooper* and *McKenna* cited the history of public officials' efforts to pressure or shut down Backpage, which is the same backdrop for the SAVE Act.  *See Cooper*, 939 F. Supp. 2d at 819; *McKenna*, 881 F. Supp. 2d at 1270; Compl. ¶¶ 24-26, 54.

Cong. Rec. H4521 (daily ed. May 20, 2014).  Representative Herrera-Beutler stated the SAVE Act's intent even more bluntly:  "We are seeking to disable Web sites like Backpage.com ...." 160 Cong. Rec. H4518-19 (daily ed. May 20, 2014).

Sponsors of the final version of the SAVE Act echoed these sentiments.  Senator Feinstein explained that "what our amendment would do" is allow online intermediaries to be prosecuted, calling out Backpage specifically.  161 Cong. Rec. S1622 (daily ed. Mar. 18, 2015) ("Internet companies [ ] are profiting [and] [t]his must stop," so the amended § 1591 "imposes liability on Web sites").  Members of Congress repeatedly emphasized that the various bills called the "SAVE Act" would impose criminal liability on online intermediaries for "facilitating" or "profiting" from ads related to sex trafficking, regardless if they had knowledge of the illegal nature of any given ad.

Even *after* Backpage filed this suit, and *after* DOJ's motion claiming that "conduct by [Backpage] ... arguably affected with a constitutional interest is not ... proscribed by" § 1591, Senators Feinstein and Kirk publicly insisted to the contrary.  They have both demanded that DOJ should prosecute Backpage under the SAVE Act amendments to § 1591 on the premise that the website can be held criminally liable merely for hosting ads if some may turn out to concern sex trafficking.  *See* Feinstein *Human Trafficking* Letter; *see also* http://www.kirk.senate.gov /?p=press_release&id=1692.  Again, DOJ ignores this – just as it failed to acknowledge all the statements in the legislative history that the SAVE Act was aimed at Backpage – and  incredibly insists that Backpage has no credible fear of prosecution.  Given the history and the record, DOJ's standing challenge borders on the frivolous.

## II.   THE SAVE ACT'S ADDITION OF "ADVERTISING" VIOLATIONS RENDER § 1591 UNCONSTITUTIONALLY VAGUE AND OVERBROAD

DOJ makes no serious attempt to satisfy the requirements of Rule 12(b)(6) – to show that Backpage's constitutional challenge based on the Save Act's vagueness is implausible, or that the facts alleged in the Complaint fail to raise the right to relief "above the speculative level." *Twombly*, 550 U.S. at 555-56.   Instead, the government admits that "Section 1591 does not define 'advertise,'" but claims it is not vague because it is "not an exotic term of art" and is readily understood based on "ordinary meanings."   Def. Mem. 15-17. Such assurances fall far short of the constitutional requirement for clarity in legislative drafting for laws that criminalize speech, and do not even address the standard for dismissal under Rule 12(b)(6).   DOJ's arguments ultimately are undermined by its own acknowledgment that an online intermediary may be subject to prosecution under § 1591 if it "*influences* or controls the content of an advertisement that it publishes."   Def. Mem. 19 (emphasis added).

### A.   The First Amendment Requires Precise Legislative Drafting

The SAVE Act must be evaluated under the well-settled rule that "a precise statute evincing a legislative judgment that specific conduct be proscribed" is required where First Amendment interests are affected.   *Act Now to Stop War & End Racism Coalition v. Dist. of Columbia*, 905 F. Supp. 2d 317, 351 n.12 (D.D.C. 2012) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 n.5 (1972)), *appeal docketed*, No. 12-7140 (D.C. Cir. oral arg. held Mar. 24, 2016).   This is essential to "assure[ ] that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation."   *Id.*   While the baseline is that "[d]ue process requires that laws give people of ordinary intelligence fair notice of what is prohibited," *Brown*, 131 S. Ct. at 2743 (citing *Grayned*, 408 U.S. at 108), "lack of

20

such notice in a law that regulates expression 'raises special First Amendment concerns because of its obvious chilling effect on speech.'"[3]  Thus, "[p]recision of regulation must be the touchstone in an area [] closely touching our most precious freedoms," *Act Now*, 905 F. Supp. 2d at 330 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)), and "government may regulate in the area of First Amendment freedoms only with narrow specificity."  *Brown*, 131 S. Ct. at 2743 (quoting *NAACP*, 371 U.S. at 433) (internal quotation marks omitted).

Moreover, where legislation affecting speech is a criminal statute, the burden on government is even higher.  "The combination of the First Amendment interests at stake and the threat of a criminal prosecution necessitates a close examination … to ensure that [] statutes [] are neither overly vague nor overly broad in their language …."  *United States v. Hsia*, 24 F. Supp. 2d 33, 56 (D.D.C. 1998) (citing *Buckley v. Valeo*, 424 U.S. 1, 40-41 (1976)), *rev'd on other grounds*, 176 F.3d 517 (D.C. Cir. 1999).  This reflects that "[v]agueness is an especial evil where the criminal provision abuts upon sensitive areas of basic First Amendment freedoms because it operates to inhibit the exercise of those freedoms."  *Thomas v. United States*, 696 F. Supp. 702, 706 (D.D.C. 1988) (quoting *Grayned*, 408 U.S. at 109) (internal quotation marks and editing omitted).  The Supreme Court has emphasized:

> the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.  These freedoms are delicate and vulnerable, as well as

---

[3]  *Id*. (quoting *Reno v. ACLU*, 521 U.S. at 871-72).  DOJ emphasizes that "[v]agueness doctrine is an outgrowth of the Due Process Clause of the Fifth Amendment, not the First Amendment," Def. Mem. 15 (quoting *United States v. Bronstein*, --- F. Supp. 3d ---, 2015 WL 9412106, at *3 (D.D.C. Dec. 22, 2105), but it is unclear to what end.  Backpage's vagueness challenge to the SAVE Act amendments arise under both the First and Fifth Amendments, *see* Compl. Count I, and in any event, there is a "heightened vagueness standard applicable to restrictions upon speech entitled to First Amendment protection."  *Brown*, 131 S. Ct. at 2735.

> supremely precious in our society.  The threat of sanctions may deter their
> exercise almost as potently as the actual application of sanctions.

*NAACP*, 371 U.S. at 433.  *Bronstein*, upon which DOJ heavily relies, Def. Mem. 15-16, similarly

recognizes that, under constitutional vagueness doctrine, "notice and fairness concerns are

heightened in the First Amendment context," 2015 WL 9412106, at *3, which "requires that

statutes targeting the content of speech must be drafted with 'precision.'"  *United States v.*

*Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010), *aff'd*, 132 S. Ct. 2537 (2012).

## B.     The SAVE Act Amendments Create Ambiguity in § 1591

The SAVE Act amendments render § 1591 unconstitutionally vague because, by adding

"advertises" to the prohibited acts without definition, and incorporating "advertising" into the

*mens rea* provision, the statute now "is written so imprecisely that it fails to give ordinary people

fair notice of the conduct it prohibits [and] so standardless that it invites arbitrary enforcement."

*Bronstein*, 2015 WL 9412106, at *3 (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556

(2015)) (internal quotation marks omitted).[4]  It is no answer to assert that the meaning of these

terms is obvious when the SAVE Act's sponsors are convinced that the language they employed

will permit the government to prosecute online services like Backpage.  *See*, *e.g.*, Feinstein

*Human Trafficking* Letter.

The government acknowledges the absence of statutory definitions, yet offers no legally

binding interpretive guidance.  The primary authority on which DOJ relies, *United States v.*

*Bronstein*, makes clear that "there must always be an ascertainable standard for inclusion and

exclusion" for a statute to avoid being invalidated as vague for failing to provide fair notice of

---

[4] The government expends considerable energy pondering whether Backpage's challenge here is facial or as-applied, Def. Mem. 15-17, but as should be clear, Backpage's claim is brought pre-enforcement and therefore challenges the SAVE Act on its face.

what it proscribes.   2015 WL 9412106, at *4 (quoting *Smith v. Goguen*, 415 U.S. 566, 578 (1974)) (internal quotation marks omitted).   Yet the government cites no other statute (related or otherwise) in which the term "advertises" appears that could suggest contours for its use in § 1591, nor does it cite any case law "that might crystallize the words' ambiguous meanings in the context" in which they are used.   *Id.* at *7.   There is also no allusion to any "heartland of paramount applications" of the terms to furnish a more precise definition of "advertises" and "advertising."   *Id.* at *8 (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010)).

The government's discussion of vagueness as an abstract concept says nothing about how the SAVE Act complies with these constitutional requirements.   By contrast, past experience with the attempted regulation of online classified websites illustrates the need for precision in drafting.   Federal courts in Washington, Tennessee, and New Jersey invalidated laws that sought to impose criminal penalties for online advertising – and similarly targeted Backpage – because key terms were undefined.   *See McKenna*, 881 F. Supp. 2d at 1278-80 ("[W]hat does it mean for the website operator to 'know' that an advertisement 'implicitly' offers sex?"); *Cooper*, 939 F. Supp. 2d at 833-34 ("[T]he term 'commercial sex act' is likely too vague to provide fair warning to potential violators or to ensure non-discriminatory enforcement."); *Hoffman*, 2013 WL 4502097, at *10 ("Among the terms the New Jersey legislature has neglected to define are 'indirect[],' 'direct[],' 'implicit,' and 'offer.'   Additionally, the Act's definition of 'advertisement for a commercial sex act,' including any 'implicit offer' of sex for 'something of value,' is also impermissibly vague.").   When the SAVE Act is considered in the actual context of its stated objectives, its vagueness is apparent.

The *McKenna*, *Cooper*, and *Hoffman* trilogy of cases expressly rejected claims that common terms used to regulate online advertising "provide[] sufficient clarity to inform a person

of ordinary intelligence of what conduct is prohibited." *Id*.  DOJ nevertheless argues here the term "advertising" is "not an exotic term of art beyond the ken of ordinary lay persons."  Def. Mem. 17.  Even if earlier efforts to restrict online classified ads do not already vaporize this generic claim, standard constitutional analysis is more than sufficient to finish the job.  A given word may be "easily understood by ordinary people" in normal conversation, but the First Amendment requires a higher level of precision when speech is criminalized.  *See Bronstein*, 2015 WL 9412106, at *6 (citing cases).  It might well be said that "loitering" is not an "exotic term of art" and that "ordinary lay persons" know what it means.  *See id*. (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999)).  But that did not prevent the Supreme Court from finding a criminal statute unconstitutionally vague where its enforceability turned on whether citizens "loiter."  *See Morales*, 527 U.S. at 56 ("[T]he vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance, and what is not.").

In *Morales*, the law was struck down as unconstitutionally vague *despite* the fact it defined the operative term, *id*. at 47 n.2, something the SAVE Act does not do.  *See also Act Now*, 905 F. Supp. 2d at 345-48 (finding "event" unconstitutionally vague).  DOJ tries to fill this gap by citing dictionary definitions (in online dictionaries, at that), but this only bolsters Backpage's vagueness argument.  *See* Def. Mem. 17-18.  Each of the online dictionary definitions of "advertise" quoted by the government refer both to promoting or making the public aware of something, such as a product or service, **and** to the transmission of that message "in some public medium of communication," like "in a newspaper, *on the Internet*, etc."  Def. Mem. at 18.  Thus, despite DOJ's argument that Backpage need not be concerned with the SAVE Act's

reach, parts of the online definitions it cites – yet somehow fails to discuss – reinforce how "advertise" can include the medium carrying the message, as well as the entity originating it.[5]

The term "advertiser" should be properly understood as the party who places an advertisement in a publication.  Compl. ¶ 60.  Otherwise, the term is indeterminate and overly broad.  By contrast, DOJ's use of online dictionaries to define "advertise" to describe both the entity placing the ad and the medium carrying it, coupled with the lack of any statutory definition, injects vagueness and ambiguity into the SAVE Act, and gives no reasonable notice as to the prohibited conduct.

Such ambiguities go to the core of the SAVE Act, and may in fact have been the purpose of the bill's sponsors.  The First Amendment vagueness doctrine exists not only so those who are subject to a law may understand its scope, but to prevent arbitrary enforcement.  *Grayned*, 408 U.S. at 108-09.  Those who wrote the law even insist the term advertise can be used expansively to ensnare websites like Backpage, and are urging that DOJ do just that.  *See supra* 8, 18-19. This is more than just "alleged" ambiguity, Def. Mem. 17, and the law's vagueness bars it from being enforced.  *See*, *e.g.*, *Bronstein*, 2015 WL 9412106, at *4 (quoting *Johnson*, 135 S. Ct. at 2561; *Coates v. City of Cincinnati*, 402 U.S. 611 (1971); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)).

---

[5]  At www.merriam-webster.com, the definition of "advertise" (cited Def. Mem. 18) includes the additional definition that it means "to announce publicly especially by a printed notice or a broadcast" or "to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize."

### C.   The Government's Interpretation of the SAVE Act Confirms its Ambiguity

DOJ confirms the absence of constitutionally required "fair notice" when it admits "the possibility that websites or publishers might engage in advertising" within the meaning of the statute.   *See* Def. Mem. § II.B.   It hypothesizes "instances where a website, magazine, or newspaper … might advertise a subscription discount or [other offers or services] that it is sponsoring," *id*. 19, but such scenarios have nothing to do with Backpage's constitutional claims. This case does not address the situation where a website or other media channel promotes *its own* goods or services.   Rather, Backpage's claims focus on how it is entirely unclear whether, and under what circumstances, conduct limited to *hosting* ads of third parties, as an *intermediary* publisher, can lead to liability under § 1591.[6]

The government even admits an intermediary or publisher could be deemed to "advertise" under § 1591 if it "influences or controls the content of an advertisement that it publishes." Def. Mem. 19.   But this statement merely heaps vagueness on top of vagueness, raising far more questions than it answers.   To begin with, what is the source of this definition?   It is found nowhere in § 1591, and it plainly contradicts other federal statutes and case law providing that online intermediaries cannot be liable for publishing third-party content.   *E.g*., *Doe v. Backpage.com*, 2016 WL 963848, at *5-6.   Moreover, what does it mean to "*influence* or control the content of an ad?"   If this refers to the nature or operations of a website, it is, again, directly contrary to federal law and policy embodied in Section 230.   *See Universal Commc'ns Sys., Inc.*

---

[6] Tellingly, DOJ refuses to say whether the scenario described in its motion – a publisher promoting *its own* services – is the only context in which intermediaries or media channels can be said to "advertise" under § 1591.   *Cf. supra* 17 (citing *Babbitt* and implications where government "has not disavowed" enforcement).   This is where DOJ's silence on the legislative history and statements of intent by the SAVE Act's sponsors and supporters is most notable.

*v. Lycos, Inc.*, 478 F.3d 413, 420-21 (1st Cir. 2007) (Section 230 provides immunity for challenges to the "construct and operation" of a website); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 414-15 (6th Cir. 2014) (*en banc*) (Section 230 applies to preclude claims that a website "encourages" unlawful content).  The fact that DOJ's own interpretation of how § 1591 "may" apply only adds additional variables to the equation – and further undermines "fair notice" of what is prohibited.

The Complaint lists various ways that sponsors and other supports of the SAVE Act have urged that the law could be employed against Backpage as an intermediary.  Compl. ¶¶ 21-22, 28, 53-55.  DOJ suggests a different interpretation of the Act, but does not contradict these concerns, and fails to even address them.  Insistence on "precision" regarding "what is prohibited," *supra* 20, is not a matter of Backpage "seek[ing] an advance guarantee that 'websites and other publishers' could never be charged as 'advertisers' pursuant to § 1591(a)(1)."  Def. Mem. 18.  Rather, it is a constitutional imperative under the First and Fifth Amendments.  The government thus has provided no basis for dismissing the complaint.

## III.   THE SAVE ACT AMENDMENTS TO § 1591'S *MENS REA* PROVISION RENDER IT UNCONSTITUTIONAL

DOJ claims that the "plain terms" of § 1591 sets forth a "knowing" scienter requirement and asks this Court to dismiss Count II based on the argument that Backpage has misinterpreted the statutory language.  Def. Mot. 20.  While it is true that some legislators sought to enact an earlier version of the SAVE Act that required actual knowledge by online intermediaries that a specific advertisement was for trafficking of a minor or the victim was subject to threats, fraud or coercion, *see* Compl. ¶¶ 30-36, 39-42, 51-52, that is not the legislation that ultimately passed.  As the Complaint explains, Senator Kirk made last-minute changes to the *scienter* standard that

became the law.  *Id*. ¶¶ 45-50.  His amendment both lowered the standard of *mens rea* and added strange and confusing ambiguities to the SAVE Act.  *Id*. ¶¶ 63-66.  DOJ says nothing about this change in the statutory language, and provides no reason to dismiss this claim.

### A.    The Save Act Creates an Indeterminate *Mens Rea* Standard

DOJ asserts repeatedly that § 1591 "sets forth a 'knowing' *means rea* requirement where the underlying act is advertising, whether the charge is brought pursuant to § 1591(a)(1) or (a)(2)."  Def. Mem. 2.  *See also id*. at 20.  Such a reading of the law would have been accurate under earlier drafts that required a person to "knowingly benefit … from," or to "knowingly … distribute[] advertising" of, conduct constituting trafficking.  *See* Compl. ¶ 31.  Various members of Congress stressed the importance of the knowledge standard of *mens rea*.  Representative Farenthold, said that the scienter requirement was "carefully crafted" so that "Internet companies and legitimate Web sites are protected" unless "[t]hey … know that they are advertising for victims of human trafficking."  161 Cong. Rec. H599 (daily ed. Jan. 27, 2015).  Likewise, Representative Sennsenbrenner observed the "'knowingly' standard" was proposed to address concerns that the "net might be too broad" because a website "will not be caught up if an advertisement for sex trafficking appears without their knowledge."  161 Cong. Rec. H600 (daily ed. Jan. 27, 2015).  *See* Compl. ¶¶ 40, 54.  Unfortunately, this version of the law was not enacted.  *Id*. ¶¶ 29-42.

As originally drafted, a "knowing" standard of *mens rea* was proposed for anyone who "benefits, financially or by receiving anything of value, from participation in a venture" that involves trafficking.  *See* Compl. ¶ 34.  Late in the process, however, Senator Kirk introduced an amendment to the language that apparently had a single purpose – to lower the level of *mens rea* for websites that might "benefit" from ads that concern trafficking, even where not knowingly.

His amendment struck the knowing standard for violations of § 1591(b)(2), leaving in place a "reckless disregard" standard of *mens rea*.  *See* Compl. ¶ 47.  The amendment left intact the "knowing" requirement only where the act **constituting a violation of Section 1591(a)(1)** is advertising.  This is the standard that ended up in the law.  *Id*. ¶¶ 49-50.

Based on these changes, a person who *places* an advertisement in violation of § 1591(a)(1) is subject to a "knowing" standard, but one who "*benefit*s, financially, or by receiving anything of value, from participation in a venture" in violation of § 1591(a)(2) is subject to a "reckless disregard" standard.  *Id*. ¶¶ 46-47.  As Representative Nadler warned, a law that lacks a proper scienter standard "could leave legitimate companies potentially liable for advertising that, despite their best efforts and use of algorithms to prevent it, may appear on their sites."  By targeting "anyone who benefits financially from such ads," it could sweep in "the platform on which the ads are posted, even though they made efforts to avoid such ads being on their platform."  *Organizational Meeting, etc.*, 114th Cong. 77 (Jan. 21, 2015).  Compl. ¶ 54.

DOJ does not address the change in statutory language at all, and merely insists (repeatedly) that a "knowing" standard of *mens rea* is required for any prosecution pursuant to § 1591(a)(1) or (a)(2) under the plain language of the SAVE Act.  Def. Mem. 14.  *See id*. at 2, 20-21.  While the standard DOJ now opts to defend is more sensible, and certainly would be more constitutionally sound, it unfortunately is not what Congress adopted.  Congress specifically struck out the reference to a "knowing" scienter standard for § 1591(a)(2), leaving it in place only for § 1591(a)(1).  The government's argument that the elements of the two subsections are the same, and thus require the same level of *mens rea*, Def. Mem. 14, might be a reasonable position, but this reading would require the court to ignore the language Congress

used (or, in this case, deleted before passage).  *See*, *e.g.*, *Cooper*, 939 F. Supp. 2d at 828 ("Every word in a statute is presumed to have meaning and purpose.") (internal quotation marks omitted).

The context in which the language was adopted also is significant.  *Id.* at 829.  If Congress intended a "knowing" standard for both Sections 1591(a)(1) and (a)(2), it would not have needed to consider Senator Kirk's amended language at all.  The preexisting bill imposed a "knowing" standard "where, in an offense under paragraph [1591(a)](2) the act constituting the violation of paragraph (1) is advertising."  But Senator Kirk's amendment struck out any reference to § 1591(a)(2) in the "knowing" standard for *mens rea*.  *See* Compl. ¶¶ 45-48.  DOJ does not explain what this change could mean, while its author was unambiguous about his purpose: "I intended to go after Backpage.com."  161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015).  In any event, DOJ's arguments on scienter – like its claims regarding vagueness – ultimately depend on competing statutory interpretations, and therefore cannot support its motion to dismiss. [7]

**B.     Speech Restrictions Require Heightened *Mens Rea***

The SAVE Act must use a heightened *mens rea* standard because the addition of "advertises" and "advertising" to § 1591's enumerated violations transformed the statute into a speech regulation.  *See Smith v. California*, 361 U.S. 147, 151-53 (1959); *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994).   As the Supreme Court recently reaffirmed, "wrongdoing must be conscious to be criminal."  *Elonis v. United States*, 135 S. Ct. 2001, 2009

---

[7] In light of DOJ's position, however, the government should be estopped from adopting any contrary interpretation of *mens rea* in any future proceedings under the SAVE Act.  Whatever decision this Court makes in this case, it should bind DOJ to its interpretation that "a 'knowing' mens rea is required for any prosecution pursuant to § 1591(a) involving advertising, whether the charge is brought pursuant to § 1591(a)(1) or (a)(2)."  Def. Mem. 14.  Thus, it would be incumbent upon the government in a prosecution under § 1591(a)(2) to prove that the defendant "knew that the person advertised would be induced to engage in a commercial sex act through force, threats of force, fraud, or coercion, [or] was under the age of 18 when so induced."  *Id.* 21.

(2015).  "The central thought is that [one] must be blameworthy in mind before he can be found guilty, a concept that courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like."  *Id*.  In terms of the SAVE Act, one upon whom the government wishes to impose liability under § 1591 "must know the facts that make his conduct fit the definition of the offense, even if he does not know that those facts give rise to a crime."  *Id*. (citation omitted).

Specifically, the imposition of criminal liability on a party for distributing speech requires *mens rea* of the fact that the communication contains prohibited material.  *Id*.  The distributor must have had knowledge of the nature and content of the material disseminated which makes it unlawful.  *Smith*, 361 U.S. at 153-54.  Under settled precedent, where criminality turns on the age of a person depicted in expressive material – for example, § 1591's provisions applicable to one who "has not attained the age of 18 years" – the First Amendment requires *mens rea* that the defendant knows the age of the person depicted.  *X-Citement Video*, 513 U.S. at 68-73, 78.  And there is no reason this should be any less true of whether force, threats, fraud or coercion were employed.  As the Supreme Court made clear in *Elonis*, "communicating *something* is not what makes conduct wrongful.  Here, the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication."  135 S. Ct. at 2011 (internal quotation marks omitted).  What is required is knowledge of the facts necessary to establish criminal activity.

This problem under the SAVE Act is exacerbated because the statute utilizes two different *mens rea* standards.[8]  Punishment can be imposed for violations committed while

---

[8]  The government's argument that the Supreme Court has not yet defined what level of scienter is required for laws regulating expression is therefore not responsive, where, as here,

"knowing," or with "reckless disregard," of facts that render activity prohibited. The statute's opacity with respect to how these disparate *mens rea* requirements apply means that, under certain readings, "advertising" violations could arise, despite a lack of the requisite knowledge on the part of the charged party. The government also argues that § 1591(a)'s scienter requirement somehow "mitigates" the Act's vagueness, but fails to explain how this could be true.[9] The modified scienter standard nonsensically places a higher level of *mens rea* on one who places an ad (knowledge under § 1591(a)(1)) than on one who arguably "benefits" from the ad (reckless disregard under § 1591(a)(2)). The claim that this somehow could "mitigate vagueness" contradicts governing authority that subjecting a person to two different legal standards "will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean." *Reno*, 521 U.S. at 871 (footnotes omitted); *Cooper*, 939 F. Supp. 2d at 828-32.

## IV.   THE SAVE ACT CREATES A DE FACTO NOTICE-AND-TAKEDOWN REGIME THAT AMOUNTS TO A HECKLER'S VETO

The government's argument directed to Count III of the Complaint that there can be no "stand-alone 'heckler's veto' claim," Def. Mem. 22, wholly misses the point. Rule 8 requires only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). That a complaint need not plead a particular legal theory "is a statement of the obvious."

---

confusion over the *mens rea* standard adds to the SAVE Act's vagueness and magnifies its chilling effects. Def. Mem. 21 n.4.

[9] The only case DOJ cites for its "mitigation" argument, *United States v. Scanio*, 705 F. Supp. 768 (W.D.N.Y. 1988) (cited Def. Mem. 20), is an out-of-district opinion by a magistrate judge, that does not involve any statute that regulates speech, or any First Amendment concerns. *See id.* at 774 ("defendant does not … contend that the statute implicates conduct protected under some specific provision of the Constitution").

*EEOC v. Catastrophe Mgmt. Sols.*, 11 F. Supp. 3d 1139, 1141 (S.D. Ala. 2014), *appeal docketed*, No. 14-13482 (11th Cir. oral arg. held Aug. 21, 2015).  What matters for purposes of assessing DOJ's motion is that "[a] complaint cannot be dismissed unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Roe v. Aware Woman Center for Choice, Inc.*, 253 F.3d 678, 684 (11th Cir. 2001) (citation omitted).  The facts set forth in the Complaint indicate that the SAVE Act creates a *de facto* notice-and-takedown regime that operates as a heckler's veto, and DOJ agrees that under the law the rational response to an allegation is to just "remove the ad."  Def. Mem. 23 n.6.  It does not matter whether this is construed as a "stand-alone" claim or just another reason the SAVE Act violates the First Amendment – DOJ provides no reason to dismiss the Complaint.

### A. The Threat of Liability for Speech for Online Platforms Creates a Heckler's Veto

One of the most basic and familiar First Amendment concepts is that the law must protect speakers, not those who would silence them.  In the physical world, this means the First Amendment does not permit "allowing the public, with the government's help, to shout down unpopular ideas."[10]  In the online world, the same concept has been recognized as a limit on both criminal and civil liability.  The heckler's veto doctrine has been applied in various contexts, including chat rooms, *Reno*, 521 U.S. at 859-60, 880, government-employer email systems, *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010), and websites that publish user-generated content.  *Dirty World*, 755 F.3d at 408, 414, 417.

---

[10] *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d Cir. 2015) (quoting *Meizer v. Bd. of Educ.*, 336 F.3d 185, 199 (2d Cir. 2003)); *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 251-52 (6th Cir. 2015) (*en banc*), *petition for cert. docketed* (U.S. Feb. 29, 2016) (No. 15-1090); *Dhiab v. Obama*, 70 F. Supp. 3d 486, 500 (D.D.C. 2014), *appeal docketed*, Nos. 16-5011, 16-5012 (D.C. Cir. Jan. 28, 2016).  *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966).

The government is simply wrong in claiming that "there is no existing legal framework … to consider such a claim on a pre-enforcement basis," Def. Mem. 22, as *Reno v. ACLU* demonstrates.  521 U.S. at 859-60, 880.  The risk here is like that in *Reno*, where the Court recognized that third parties could attempt to "manufacture" violations by putting a speaker on notice that they might be violating the law.  *See* Def. Mem. 23.  The problem is even more pronounced in the case of online intermediaries that host third-party content.

Unlike DOJ, courts are much more sensitive to the extent to which knowledge-based crimes implicating speech create a possibility of empowering notice to "confer broad powers of censorship, in the form of a 'heckler's veto.'"  *Reno*, 521 U.S. at 880.  All it may take is for a critic of the website to send notices, founded or not, claiming that a third-party posting is unlawful.  Such things happen.  *E.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d at 234. As recognized in *Dirty World*, persons targeting speech they deem "unwelcome" can confront interactive service providers with a choice between removing the content at issue or facing litigation costs and potential liability, which allows for a "heckler's veto" in the absence of protection against such efforts.  *See* 755 F.3d at 407.  *See also Zeran v. America Online, Inc.*, 129 F.3d 327 (7th Cir. 1997).

Under the SAVE Act, when is an intermediary like Backpage chargeable with "knowledge" that someone in one of the millions of ads on its site was posted in violation of § 1591?  Backpage routinely reports to NCMEC ads that may concern child exploitation.  *See* Compl. ¶¶ 17-18.  Does such general awareness of possible misuse give rise to "knowledge" under § 1591?  Some might argue that even unverifiable assertions that an ad implicates trafficking could constitute "knowledge."  Are online intermediaries obligated to immediately remove such content?  When the law does not clearly answer questions like these, the inevitable

result will be self-censorship.  *See*, *e.g*., *Cooper*, 939 F. Supp. 2d at 830 ("[W]ebsites such as

Backpage.com will bear an impossible burden to review all of their millions of postings, or, more

likely, shut down their adult services section entirely.").

The First Amendment does not permit the law to place the burden of doubt on speakers or

online intermediaries, forcing them to err on the side of censorship.  The SAVE Act violates this

principle by creating uncertainty about whether websites may be criminally liable for

advertisements posted by others.  And it creates a mechanism by which an unverified complaint

could effectively force such sites to make censorship their default choice, thus effectively

institutionalizing a heckler's veto.

### B.      DOJ Admits Self-Censorship is the Safest Response to the SAVE Act

DOJ essentially admits that the SAVE Act establishes a "when in doubt, leave it out"

standard.  The government claims that Backpage faces no danger from gaining knowledge

through third-party notifications, because if it became aware of an illegal ad on its site, it would

presumably remove it.  Def. Mem. 23 n.6.  But that is the very essence of the heckler's veto –

government action or inaction that favors removal of the targeted speech.

DOJ's "reassurance" that "[t]here is no reason to believe that the Government would

initiate a prosecution … in such a case," *id*., only reinforces this point.  It means that Backpage's

First Amendment rights depend on prosecutorial discretion, an uncertain level of assurance the

Supreme Court has rejected.  *See*, *e.g.*, *Stevens*, 559 U.S. at 480 (First Amendment does not

permit making freedom to speak dependent upon prosecutorial discretion).  In *Reno*, Judge

Sloviter explained why such assurances are too tenuous to protect constitutional freedoms:

> "[T]he bottom line is that the First Amendment should not be interpreted
> to require us to entrust the protection it affords to the judgment of

> prosecutors.  Prosecutors come and go.  Even federal judges are limited to
> life tenure.  The First Amendment remains to give protection ….

*ACLU v. Reno*, 929 F. Supp. 824, 857 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997).  Given the

numerous ways Backpage has been hounded at various levels of government, there is no basis

for accepting DOJ's assurances.  Ultimately, the SAVE Act places the burden of that uncertainty

on the speaker, with the only clear way to resolve doubt being through by self-censorship.

## V.      A DECLARATORY JUDGMENT SHOULD ISSUE EVEN IF THE COURT ACCEPTS THE ATTORNEY GENERAL'S READING OF § 1591

Backpage has shown that the amended § 1591 is open to different interpretations.  Even

the Attorney General's arguments in this action, and the legislative and public statements of the

SAVE Act's sponsors, diverge on whether the statute can apply to Backpage for hosting content

posted by third parties.  *See supra* 8, 14-15, 17, 18-19, 25, 26-27, 30.  As the Complaint urges,

the Court should issue a declaratory ruling that the SAVE Act is unconstitutional on its face.

However, even if the Court agrees with DOJ that the statute's new "advertising" restrictions do

not apply to online intermediaries that do not author, control or know the content of the ad in

question, that is no reason to deny declaratory relief.  In this circumstance and in light of the

government's representations, a ruling formalizing a limiting construction may be exactly what

is required.[11]  A ruling defining the SAVE Act's constitutional boundaries could "serve a useful

purpose in clarifying the legal relations in issue" and could "terminate and afford relief from the

uncertainty, insecurity, and controversy giving rise to the proceeding."  *Nat'l R.R. Passenger*

---

[11] *See* Def. Mem. 16 (citing *Bronstein*, 2015 WL 9412106, at *7).  Neither the representations in DOJ's brief regarding § 1591's application, nor its "assumptions" about when it would "initiate a prosecution" against Backpage, bind the government, nor are they sufficiently protective of Backpage's constitutional rights.  In these circumstances, a ruling by the Court would hold the government to its representations about the law.

*Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424, 431 (D.D.C. 1987) (citing *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)).

## CONCLUSION

Various Members of Congress "intended to go after Backpage.com," and persuaded enough of their colleagues to join them in passing the SAVE Act. There is a credible threat of prosecution of Backpage under a statute that employs undefined terms to establish a violation and uncertain levels of scienter to impose criminal culpability. The Complaint in this matter has stated claims that, at the very least, are "plausible" under Rules 12(b)(1) and 12(b)(6). Accordingly, the Motion to Dismiss must be denied.

DATED:  March 28, 2016.

By:      /s/ Robert Corn-Revere
   Robert Corn-Revere (DC Bar #375415)
   bobcornrevere@dwt.com
   Ronald G. London (DC Bar #456284)
   ronnielondon@dwt.com
   Lisa B. Zycherman (DC Bar #495277)
   lisazycherman@dwt.com
   DAVIS WRIGHT TREMAINE LLP
   1919 Pennsylvania Ave., N.W., Suite 800
   Washington, D.C. 20006
   Telephone:  (202) 973-4200

   James C. Grant (*pro hac vice*)
   jimgrant@dwt.com
   DAVIS WRIGHT TREMAINE LLP
   1201 Third Avenue, Suite 2200
   Seattle, WA 98101
   Telephone:  (206) 622-3150

   Counsel for Plaintiff