## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )
BACKPAGE.COM, LLC,              )
                                )
      Plaintiff,               )
                                )
    v.                         )     Civil Action No. 15-2155 (RBW)
                                )
LORETTA E. LYNCH, in her official )
capacity as Attorney General of the United )
States of America,              )
                                )
      Defendant.               )
_____)

## MEMORANDUM OPINION

The plaintiff, Backpage.com, LLC ("Backpage.com"), brought this action against the defendant, Loretta Lynch, in her official capacity as Attorney General of the United States of America ("the government"), challenging the constitutionality of the Stop Advertising Victims of Exploitation Act of 2015 ("SAVE Act"), which amended 18 U.S.C. § 1591 (2000), "a statute that prohibits certain conduct related to sex trafficking of children and those subjected to force, fraud, or coercion," and added "advertising to the types of conduct prohibited under § 1591(a)." Memorandum in Support of Defendant's Motion to Dismiss ("Gov't's Mem.") at 1; see also Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1. Currently pending before the Court is the Defendant's Motion to Dismiss ("Gov't's Mot."), ECF No. 10, which seeks dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), or alternatively, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon careful consideration of the parties' submissions,[1] the Court concludes that it must grant

---

[1] In addition to the filings already identified, the Court considered the following submissions in reaching its decision: (1) the plaintiff's Opposition to Motion to Dismiss ("Pl.'s Opp'n"); and (2) the government's Reply in Support of Defendant's Motion to Dismiss ("Gov't's Reply").

the government's motion to dismiss this action for lack of subject matter jusrisdiction pursuant to Rule 12(b)(1).

# I.   BACKGROUND

## A. Statutory Background

In 2000, Congress passed the Trafficking Victims Protection Act ("Trafficking Act"), Pub. L. No. 106–386, §§ 101–113, 114 Stat. 1464 (2000) (codified as amended in sections throughout Titles 8, 18, and 22 of the United States Code), "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims," 22 U.S.C. § 7101(a) (2012). The legislation was enacted because "Congress recognized that human trafficking, particularly of women and children in the sex industry 'is a modern form of slavery, and it is the largest manifestation of slavery today.'" United States v. Walls, 784 F.3d 543, 548 (9th Cir. 2015) (quoting 22 U.S.C. § 7101(b)(1)), cert. denied, 136 S. Ct. 226 (2015). Accordingly, through the Trafficking Act, Congress adopted "a comprehensive regulatory scheme that criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." Id.

This comprehensive scheme proscribes "severe forms of tracking in persons," including "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion," and "sex trafficking . . . in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C § 7102(9)(A). Section 1591(a) of the statute, as originally enacted, imposed criminal penalties for any individual who knowingly

> (1) in or affecting interstate commerce recruits, entices, harbors, transports, provides, or obtains by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing that force, fraud or

> coercion . . . will be used to cause the person to engage in a commercial sex act, or that person has not attained the age of 18 years and will be caused to engage in a commercial sex act.

Pub. L. No. 106–386, § 112.  However, in 2008, Congress amended the <u>mens rea</u> requirement of § 1591(a), allowing for the prosecution of a person who commits an "act identified in § 1591(a)(1) and (a)(2) where [the person] acted 'knowing, <u>or in reckless disregard of the fact</u>,' that force, fraud, or coercion [would] be used or that the individual involved is a minor."  Gov't's Mem. at 4 (citing the William Wilberforce Trafficking Victims Protection Act of 2008, Pub. L. No. 110–457, 122 Stat. 5044 (2008)).  Moreover, Congress added subsection (c) to the statute, which eliminated the government's burden of demonstrating that the defendant had the requisite <u>mens rea</u> of either acting knowingly, or in reckless disregard of the fact that the individual caused to engaged in a commercial sexual act prohibited by subsection (a)(1) had not reached the age of eighteen, provided that "the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited."  <u>Id.</u>

Pertinent to this case, Congress, in 2015, further amended § 1591(a) through the SAVE Act to include "advertis[ing]" as a type of conduct made criminal for sex trafficking acts covered by § 1591(a)(1).  Compl. ¶ 47; Gov't's Mem. at 5 (citing the SAVE Act, Pub. L. No. 114–22, § 118(b)(1)).  Additionally, the SAVE Act "amended the <u>mens rea</u> requirement set forth in the language below § 1591(a)(2)."  Gov't's Mem. at 5 (citing the SAVE Act, Pub. L. No. 114-22, § 118(b)(2)); <u>see also</u> Compl. ¶ 47.  Consequently, § 1951(a) now provides:

(a) Whoever knowingly –

>> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, <u>advertises</u>, or maintains by any means a person; or

(2) benefits financially or by receiving anything of value from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C.A. § 1591(a) (2015) (emphasis added).

## B. Factual Background

Backpage.com is a limited liability company, organized and existing under the laws of Delaware, with its principal place of business in Dallas, Texas. Compl. ¶ 8. Primarily, Backpage.com hosts an online classified advertising service ("web service") that was created in 2004 and is located at www.backpage.com. Id. ¶ 15. As the second-largest web service of its kind, after Craigslist, id.; Gov't's Mem. at 5, Backpage.com's web service operates in all fifty states and the District of Columbia. Compl. ¶¶ 8, 15; Gov't's Mem. at 5. Users of Backpage.com's web service may post advertisements under a number of categories (e.g., local places, buy/sell/trade, automotive, rentals, real estate, jobs, dating, adult, and services) and various subcategories, and millions of advertisements are placed each month. Compl. ¶¶ 15–16; Gov't's Mem. at 5. Users "provide all content for their ad[vertisements] . . . , including all text, titles, and photographs." Compl. ¶ 17. But, even though "Backpage.com does not dictate any content, . . . it does screen, block, and remove ad[vertisements] that violate the website's terms of use." Compl. ¶¶ 17–18. And, "Backpage.com prohibits illegal content and activity on its website and takes numerous steps to prevent such misuse, especially to guard against any human trafficking or child exploitation." Compl. ¶ 18; Gov't's Mem. at 5.

4

On or about October 2010, various public officials and state attorneys general began pressuring Backpage.com to remove the "adult services" category from its website.[2] Id. ¶¶ 20–21 (citing statements by politicians who had written to Backpage.com or made comments in regards to legislative resolutions that sought to pressure Backpage.com to eliminate its "adult services" category). "[M]aintain[ing] that censorship is not a solution to human trafficking or child exploitation," Compl. ¶ 23, Backpage.com has refused to remove the "adult services" category from its website, "advocat[ing] that a better approach is to use the Internet and to work with cooperative website providers such as [itself] to identify, investigate and prosecute illegal conduct and rescue victims," id.

In 2012, three states "expressly target[ed] Backpage.com," id. ¶ 24, when they "enacted criminal statutes to censor adult ads on [its website]," id. ¶ 2. Backpage.com challenged the constitutionality of these state laws, and "[i]n each instance, federal courts enjoined the laws, finding them unconstitutional under the First Amendment . . . [because] the states' efforts to regulate or effectively block [escort] ads and [escort services] 'would likely chill protected speech.'" Id. ¶¶ 24–25 (citing cases) (quoting Backpage.com, LLC v. McKenna, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012). And as noted above, in 2015, after these three cases were decided, Congress enacted the SAVE Act, which among other amendments, "added the term 'advertises' among the predicate acts for criminal sex trafficking in [§] 1591." Id. ¶ 1.

Intending to maintain an "adult services" category as part of its web service, see id. ¶ 23; Gov't's Mem. at 10, Backpage.com filed this action, asserting a pre-enforcement challenge to the SAVE Act, see generally Compl.; Gov't's Mem. at 1. Specifically, Backpage.com contends that the "[p]rovisions of the SAVE Act . . . are . . . unconstitutionally vague, overbroad[,] and

---

[2] In its Complaint, Backpage.com notes that prior to the pressure it received to remove the "adult services" category form its website, Craigslist was targeted by many public officials and state attorneys general to do the same, and in September of 2010, Craigslist removed their "adult services" category from its website. See Compl. ¶¶ 19–20.

infringe First Amendment rights," id. ¶ 3.  In response, the government moves to dismiss the Complaint on the grounds that Backpage.com "lacks standing to bring this pre-enforcement challenge," and thus, dismissal is required under Rule 12(b)(1) because the Court lacks subject matter jurisdiction, or in the alternative, that Backpage.com has failed to state a claim upon which relief can be granted as required under Rule 12(b)(6).  Gov't's Mem at 1–2.

## II.      STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under Federal Rule of Civil Procedure 12(b)(1) 'presents a threshold challenge to the court's jurisdiction . . . .'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, a district court is obligated to dismiss a claim if it "lack[s] . . . subject matter jurisdiction[.]"  Fed. R. Civ. P. 12(b)(1).  Because "it is presumed that a cause lies outside [a federal court's] limited jurisdiction," id. (quoting Kokkonen, 511 U.S. at 377), the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the district court "need not limit itself to the allegations of the complaint."  Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction [in] the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Additionally, a district court must "assume the truth of all material factual

allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving [a 12(b)(1) motion]." Grand Lodge, 185 F. Supp. 2d at 13–14.

## III.   STANDING

As a preliminary matter, the Court must "begin . . . with the question of subject matter jurisdiction" before turning to the merits of the plaintiff's claims. Am. Freedom Law Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015) (Walton, J.) (quoting Aamer v. Obama, 742 F.3d 1023, 1028 (D.C. Cir. 2014)); see also NO Gas Pipeline v. Fed. Energy Regulator Comm'n, 756 F.3d 764, 767 (D.C. Cir. 2014) ("It is fundamental to federal jurisprudence that Article III courts such as ours are courts of limited jurisdiction.  Therefore, 'we must examine our authority to hear a case before we can determine the merits.'" (quoting Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 47 (D.C. Cir. 1999))).  "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony List v. Driehaus, __ U.S. __, __, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., art. III, § 2).  "The doctrine of standing gives meaning to these constitutional limits of Article III by identify[ing] those disputes which are appropriately resolved through the judicial process." Id. (quoting Lujan, 504 U.S. at 560).  "Indeed, the Court 'need not delve into [a plaintiff's] myriad constitutional and statutory claims [where] the [plaintiff] lacks Article III standing . . . .'" Am. Freedom Law Ctr., 106 F. Supp. 3d at 108 (quoting Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912, 915 (D.C. Cir. 2003)).  "This is because a court may not 'resolve contested questions of law when its jurisdiction is in doubt,' as '[h]ypothetical jurisdiction produces nothing more than a

hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning.'" <u>Id.</u> (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 101 (1998)).

"Courts have 'always insisted on strict compliance with this jurisdictional standing requirement . . . [a]nd [this Court's] standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [this Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" <u>Id.</u> (quoting <u>Raines v. Byrd</u>, 521 U.S. 811, 819–20 (1997)). "The irreducible constitutional minimum of standing contains three elements: (1) injury in fact; (2) causation; and (3) the possibility of redress by a favorable decision." <u>Id.</u> (citing <u>Lujan</u>, 504 U.S. at 56–61); <u>see also</u> <u>Susan B. Anthony List</u>, __ U.S. at __, 134 S. Ct. at 2341. "'The party invoking federal jurisdiction bears the burden of establishing' standing," <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. __, __, 133 S. Ct. 1138, 1148 (2013) (citations omitted), and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation," <u>Susan B. Anthony List</u>, __ U.S. at __, 134 S. Ct. at 2342 (quoting <u>Lujan</u>, 504 U.S. at 561). Here, the parties only dispute whether there is a sufficient injury in fact. <u>See</u> Gov't's Mem. at 9; Pl.'s Opp'n at 1.

The injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" <u>Susan B. Anthony List</u>, __ U.S. at __, 134 S. Ct. at 2341 (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)). "An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical. An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." <u>Id.</u> (citations and quotations omitted). And, as here,

8

where a plaintiff raises a pre-enforcement First Amendment challenge to a statute, "[s]ubjective chill alone" is not a sufficient injury in fact to confer standing. Johnson v. District of Columbia, 71 F. Supp. 3d 155, 159 (D.D.C. 2014) (quoting Act Now to Stop War & End Racism Coal. v. District of Columbia, 589 F.3d 433, 435 (D.C. Cir. 2009)) (internal quotations omitted).

However, whenever "the threatened enforcement of a law creates an Article III injury," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2342, "it is not necessary that [a] plaintiff first expose [itself] to actual arrest or prosecution to be entitled to challenge [a] statute that [it] claims deters the exercise of [its] constitutional rights." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Steffel v. Thompson, 415 U.S. 488, 494 (1974)) (internal quotations omitted); see also Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."). Instead, "a plaintiff satisfies the injury-in-fact requirement where [it] alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2334 (quoting Babbitt, 442 U.S. at 298). A credible threat of prosecution exists when "the [challenged] law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392 (1988) (citations omitted).

In its effort to satisfy the injury-in-fact requirement, Backpage.com first alleges that it "intends 'to engage in a course of conduct arguably affected with a constitutional interest,'" Pl.'s Opp'n at 13 (quoting Babbitt, 442 U.S. at 298), because "[i]t hosts an online classified ad service

and intends to continue providing that forum for third parties' speech[, and s]everal courts have held that hosting advertisements – including adult-oriented and escort ads – is protected by the First Amendment," id. (citing cases). Additionally, it contends that because the SAVE ACT "'is aimed directly at Backpage.com, [and] if [its] interpretation of the statute is correct,' [it] will have to take steps to comply [with the statute] 'or risk criminal prosecution.'" Pl.'s Opp'n at 14–15 (citing Backpage.com, LLC v. Cooper, 939 F. Supp. 805, 819 (M.D. Tenn. 2013) (quoting Am. Booksellers Ass'n, 484 U.S. at 392)). Further, since "the SAVE Act's legislative history is rife with statements that its sponsors and supporters 'intended to go after Backpage.com,'" id. at 17, and because the government has "not disavow[ed] that it will pursue Backpage[.com] under th[is] law," id., Backpage.com contends that it faces a credible threat of prosecution.

Backpage.com stumbles at the outset in its attempt to demonstrate Article III standing because the course of conduct it alleges an intent to continue performing is not "'proscribed by [the] statute' they wish to challenge." Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2344 (quoting Babbitt, 442 U.S. at 298). Backpage.com represents that it intends to continue hosting third party advertisements, including advertisements that are adult-oriented and concern escort services. See Pl.'s Opp'n at 13 (citing Compl. ¶¶ 15–18). And it alleges, albeit in general, an intent to engage in conduct "arguably affected with a constitutional interest" because First Amendment protections extend to commercial advertisements, including advertisements concerning consensual sex between adults. See id.; see also Reno v. Am. Civil Liberties Union, 521 U.S. 844, 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'" (quoting Sable Commc'ns of Cal., Inc. v. F.C.C., 492 U.S. 115, 125 (1989))); see also Bigelow v. Virginia, 421 U.S. 809, 818 (1975) ("The central assumption made

by the Supreme Court of Virginia was that the First Amendment guarantees of speech and press are inapplicable to paid commercial advertisements. Our cases, however, clearly establish that speech is not stripped of First Amendment protection merely because it appears in that form." (citing cases)).

Despite its assertions, what encumbers Backpage.com's position is that its "intended future . . . conduct," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2344, of hosting third party advertisements, some of which are for legal "adult services," see Pl.'s Opp'n at 13, is not "arguably . . . proscribed by [the SAVE Act, the] statute [it] wishes to challenge," id. (quoting Babbitt, 442 U.S. at 298). The SAVE Act explicitly prohibits advertisements of illegal sex trafficking of a minor or a victim of force, fraud, or coercion. 18 U.S.C. § 1591(a). And there is no doubt that advertisements that promote these types of conduct are not afforded First Amendment protection. See U.S. v. Williams, 553 U.S. 285, 297 ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."); see also Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 563–64 (1980) ("Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban . . . commercial speech related to illegal activity."). However, the SAVE Act does not "sweep[] broadly and cover[] the subject matter of [Backpage.com's] intended speech," which is hosting third party advertisements, including advertisements of legal adult sexual services, conduct that is "arguably affected with a constitutional interest." Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2344. In fact, Backpage.com does not allege that the SAVE Act extends to their intended conduct of hosting legal third party advertisements; rather, it focuses the lion's share of its pre-enforcement challenge on who may be held liable under § 1591(a). See Pl.'s

Opp'n at 15 ("The government argues that Backpage[.com] 'does not suggest . . . ambiguity [as to] which advertisements would be . . . related to sex trafficking,' but rather 'only [on] . . . who may be charged . . . as one who 'advertises' . . . and what mens rea is required[.]" Gov't's Mem. [at] 11. But that is entirely the point – the statute is vague regarding whether Backpage[.com] or the third parties who post content may be prosecuted (or both), and what scienter is required.").

Backpage.com acknowledges that it does not intend to host advertisements for illegal sex trafficking, representing that it "screen[s], block[s], and remove[s] ads that violate the website's terms of use . . . [and] prohibits illegal content and activity on its website and takes numerous steps to prevent such misuse, especially to guard against human trafficking or child exploitation." Compl. ¶¶ 17–18. While the Supreme Court has repeatedly emphasized that its jurisprudence does not require Backpage.com "to confess that [it] will in fact violate the law" before it "wishes to challenge the constitutionality of [the SAVE Act]," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2345 (quoting Babbitt, 442 U.S. at 301), Backpage.com still must "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest," Babbitt, 442 U.S. at 298, and that conduct must be "proscribed by [the] statute [it] wishes to challenge," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2344, to have standing to pursue a pre-enforcement action, Babbitt, 442 U.S. at 298 ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" (emphasis added) (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973))). But, even if Backpage.com "did start [hosting advertisements of sex trafficking, it] could not contend that [its] speech would be 'arguably affected with a constitutional interest,'" Am. Library Ass'n v.

Barr, 956 F.2d 1178, 1193 (D.C. Cir. 1992) (quoting Babbitt, 442 U.S. at 298), as such speech is not protected by the First Amendment. Therefore, the Court does not find that Backpage.com's "intended speech is 'arguably proscribed' by the [SAVE Act, the] law" it seeks to challenge. Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2344 (finding that the "petitioners' intended conduct [was] 'arguably . . . proscribed by [the] statute' they wish[ed] to challenge" because the challenged law "swe[pt] broadly, and cover[ed] the subject matter of [the] petitioners' intended speech").

As further support for its position that it has standing to bring this pre-enforcement challenge to the SAVE Act, Backpage.com cites the decisions of several courts that concluded that it had standing to "challenge[] state laws that targeted online classified advertising sites." Pl.'s Opp'n at 15. Specifically, Backpage.com contends that these courts "held that hosting advertisements – including adult-oriented and escort ads – is protected by the First Amendment," id. at 13 (citing Backpage.com, LLC v. Dart, 807 F.3d 229 (7th Cir. 2015); Backpage.com, LLC v. McKenna, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805 (M.D. Tenn. 2013)),[3] and that Backpage.com has standing here even though it "'would be unlikely to face prosecution' because it 'has not alleged that it intends to violate the law' and takes measures 'to screen illicit ads,'" id. at 15 (citing Cooper, 939 F. Supp. 2d at 818). However, Backpage.com's reliance on these cases is unavailing because, as the government notes, "none of th[ese] cases support [Backpage.com having] standing [in this case], primarily because th[ese] cases rest on different facts and different claims. . . . [and] the challenged state actions actually implicated [Backpage.com's constitutionally protected] First Amendment

---

[3] Backpage.com also cites Backpage.com, LLC v. Hoffman, No. 13-cv-03952, 2013 WL 4502097 (D.N.J. Aug. 20, 2013), as support for its standing argument. However, the district court in that case did not address the question of whether Backpage.com had standing to seek a preliminary injunction against enforcement of the challenged statute; rather, the district court addressed solely whether granting injunctive relief was appropriate. Hoffman, 2013 WL 4502097, at *5–8. The Court, therefore, does not find further consideration of that case pertinent to its analysis.

interests." Gov't's Reply at 3.

For example, in Backpage.com, LLC v. Dart, "Backpage[.com] sought a preliminary injunction to stop the [defendant]'s campaign of starving the company by pressuring credit card companies to cut ties with its website." 807 F.3d at 230. In that case, the defendant, a county sherriff, "decided to proceed against Backpage[.com] not by litigation but instead by suffocation, depriving the company of ad revenues by scaring off its payments-service providers." Id. at 231. To achieve this objective, the defendant sent a letter to both "MasterCard's [Chief Executive Officer] and Board of Directors and to the corresponding personnel of Visa[,] . . . request[ing] that [their] institution[s] immediately cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com." Id. Because "[t]he First Amendment forbids a public official [from] attempt[ing] to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands," id., the Seventh Circuit reversed the district court's denial of Backpage.com's request for a preliminary injunction, id. at 238. But, Backpage.com, in this case, has not shown that it has or will suffer irreparable injury or that its constitutionally protected speech falls under the purview of the SAVE Act. See id. at 231 ("[The defendant] demand[ed] that [the credit card companies] cease and desist from placing any ads on 'websites like Backpage.com.'"). Instead, Backpage.com primarily alleges that it may face criminal liability depending on which mens rea of § 1591(a) applies. See Compl. ¶ 5; see also Pl.'s Opp'n at 15. Therefore, the Seventh Circuit's analysis in Dart provides no support for Backpage.com having standing here.

Additionally, in Backpage.com, LLC v. McKenna, Backpage.com sought a preliminary injunction against a state law that criminalized "the offense of advertising commercial sexual abuse of a minor." 881 F. Supp. 2d at 1265. While focusing its standing analysis on whether a

14

credible threat of prosecution existed, see id. at 1270, the district court in McKenna concluded

that Backpage.com had standing because it could "show that there is a credible threat that [the

challenged state law would] be enforced against [it because state] legislators ha[d] openly stated

that the challenged statute [was] aimed at Backpage.com and that they [sought] to eliminate

escort ads and similar Internet postings," id.  Moreover, the McKenna court agreed that

Backpage.com's interpretation of the statute was "correct," id. – that "'the law [would] require

them to undertake the impossible task [of] review[ing] and censor[ing] third-party content, or

obtain[ing] and retain[ing] the required forms of identification from all third-party users seeking

to post such content, or block[ing] content altogether,'" id.  But, in this case, Backpage.com has

not presented evidence that Congress sought to eliminate all advertisements of a sexual nature

from its website through the adoption of the SAVE Act; rather, the legislation is directed only at

those advertisements concerning illegal sex trafficking, which do not constitute constitutionally

protected speech.  See Compl. ¶ 28(b) (citing statement in the legislative history of the SAVE

Act by a Congressional member that the statute "is necessary to end facilitation of sex trafficking

by Web sites like Backpage.com and others who commercially advertise this criminal activity")

(emphasis added)[4]; Pl.'s Opp'n at 18-19.  And Backpage.com does not allege that it would be

---

[4] Backpage.com also cites two additional Congressional statements in the legislative history of the SAVE Act, see Compl. ¶ 28, but, Backpage.com's reliance on these two statements is of no avail either because they also show that Congress sought to eliminate only those advertisements concerning illegal sex trafficking. First, Backpage.com cites Illinois Senator Mark Kirk's statement that "[he] intended to go after Backpage.com. . . . We really ought to be able to charge them. . . ." Id. ¶ 28(a) (citing 161 CONG. REC. S1458 (daily ed. Mar. 12, 2015) (statement of Sen. Kirk)).  However, Senator Kirk's statement came after a recitation on how the proposed amendment being discussed was derived from the research conducted by Congress on the prevalence of sex trafficking on the Internet, see 161 CONG. REC. S1457–58 (daily ed. Mar. 12, 2015) (statement of Sen. Kirk), and Senator Kirk's statement was made in reference to a different "amendment [that he] was trying to offer earlier th[at] week on the SAVE Act," id.  Nontheless, Senator Kirk noted that he "intended to go after [B]ackpage.com [because it] is the largest provider of slavery-related services in the country. They make about $30 million a year off of slavery. We really ought to be able to charge them to clean up the mess they have created." Id.  Thus, Senator Kirk's statements were directed only at advertisements concerning illegal activity, not advertisements concerning consensual adult services. Additionally, Backpage.com cites part of a statement by Washington State House of Representative Jaime Herrera-Beutler, where he stated:  "We are seeking to disable Web sites like Backpage.com. . . ." Compl. ¶ 28(c) (citing 160 CONG. REC.

(continued . . .)

forced "to take significant and costly compliance measures" to comply with the SAVE Act "or

otherwise risk criminal prosecution." Am. Booksellers Ass'n, 484 U.S. at 392. In fact,

Backpage.com acknowledges that it already

> voluntarily employ[s] extensive monitoring to identify improper content,
> including automated filtering and manual review. . . . [and that it also] voluntarily
> reports suspect ads to the National Center for Missing and Exploited Children. [It
> further notes that it] regularly works with local, state and federal law enforcement
> to support investigations and prosecutions, including promptly responding to
> subpoenas, providing training to law enforcement, removing and blocking posts at
> their request, and even conducting independent research to assist in rescuing
> victims and arresting and prosecuting criminals.

Compl. ¶18. The Court, therefore, does not find the analysis in McKenna persuasive considering

the distinguishable circumstances here.

Likewise, in Backpage.com, LLC v. Cooper, Backpage.com sought a preliminary

injunction against a state law that criminalized "the sale of certain sex-oriented advertisements."

939 F. Supp. 2d at 813. There, the district court focused its standing analysis solely on the

question of whether a credible threat of prosecution existed. See id. at 819 ("[T]he injury-in-fact

requirement is automatically met, if 'the law is aimed directly at plaintiffs, who, if their

interpretation of the statute is correct, will have to take significant and costly compliance

measures or risk criminal prosecution.'" (emphasis added) (quoting Am. Booksellers Ass'n, 484

U.S. at 392)).[5] And the court concluded that Backpage.com had standing to seek a preliminary

---

(. . . continued)

H4518–19 (daily ed. May 20, 2014) (statement of Rep. Herrera-Beutler). But, Representative Herrera-Beutler's entire statement was that, "We are here not just to discuss the problem, but the solutions. We are seeking to disable Web sites like [B]ackpage.com that advertise children for commercial sex and make it a Federal crime for a company to knowingly post advertisements for sex with minors." 160 CONG. REC. H4521 (daily ed. May 20, 2014) (statement of Rep. Herrera-Beutler). Thus, Representative Herrar-Beutler's statement demonstrates that the legislative efforts sought to target only advertisements concerning illegal sex trafficking through the SAVE Act, and Backpage.com's omission of this essential portion of Representative Herrera-Beutler's statement dramatically alters the context in which her statement was made.

[5] Backpage.com argues that the "injury-in-fact [requirement] is automatically met, if the law is aimed directly at [the] plaintiff[], who, if [its] interpretation of the statute is correct, [is] placed at risk of criminal prosecution." Pl.'s

(continued . . .)

injunction because it "ha[d] shown sufficient evidence that it [was] the direct target of the law, and would have to take cost-prohibitive measures to comply with its provisions." <u>Id.</u> Moreover, the parties in <u>Cooper</u> did not dispute that the law was passed "to pressure Backpage.com to stop selling adult services advertisements," <u>id.</u>, and "Backpage.com allege[d] that it would have to undertake an individual review of the millions of ads posted on its site each month and likely conduct in-person identification checks of users, which it call[ed] 'a practical impossibility,'" <u>id.</u> (citation omitted). The court further noted that, "[e]ven if the statute did not directly target Backpage.com, [it nonetheless concluded that] Backpage.com ha[d] alleged sufficient facts to establish a credible threat of prosecution under <u>Babbitt</u>," because it clearly alleged that "it intend[ed] to continue hosting adult and escort services advertisements, which it argue[d might] be proscribed by the statute's vague and overboard scope. . . . [and because] the [d]efendants assert[ed] in their briefs and supporting documents that Backpage.com ha[d] hosted and continue[d] to host paid advertisements that violate the law." <u>Id.</u> at 820. Again, similar to <u>McKenna</u>, the facts and Backpage.com's allegations in this case are distinguishable from those in <u>Cooper</u>, because Backpage.com has not alleged here that its constitutionally protected speech is proscribed by the SAVE Act or that it will have to employ "significant and costly compliance measures" to comply with the statute. Therefore, the Court does not find the analysis in <u>Cooper</u>

(. . . continued)

Opp'n at 17 (citations and internal quotations omitted). However, Backpage.com's characterization of the language cited in <u>Cooper</u> and derived from <u>Am. Booksellers Ass'n</u>, mischaracterizes the standard. As the Supreme Court noted, the plaintiff booksellers in <u>Am. Booksellers Ass'n</u> were able to seek pre-enforcement review of the challenged statute because they "introduced 16 books they believed were covered by the statute and testified that costly compliance measures would be necessary to avoid prosecution for displaying such books." <u>Susan B. Anthony List</u>, __ U.S. at __, 134 S. Ct. at 2343. Thus, as the government correctly notes, the Supreme Court "did not establish a rule of 'automatic' standing based on the notion of a law targeting a specific individual or business. Rather, the law at issue in that case was 'aimed directly' at the plaintiff booksellers in that it directly regulated bookstore displays." Gov't's Reply at 5. Thus, Backpage.com must also show that its interpretation of the SAVE Act is correct, presumably by showing that its constitutionally protected speech is proscribed by the SAVE Act, and that it would have to take significant compliance measures to comply with the statute or risk criminal prosecution. And, unlike <u>Am. Booksellers Ass'n</u>, Backpage.com has not alleged or demonstrated that either its constitutionally protected speech is chilled or proscribed by the SAVE Act or that it would have to undergo "significant and costly compliance measures" to avoid the risk of prosecution. 484 U.S. at 642.

persuasive authority either.

The facts in this case are more aligned with those in <u>American Library Association v. Barr</u>, 956 F.2d 1178.  In <u>Barr</u>, the plaintiffs "sought an injunction and a judgment declaring [the Child Protection and Obscenity Act of 1988's] recordkeeping and forfeiture provisions to be unconstitutional, in violation of the First Amendment."  956 F.2d at 1181.  Because the plaintiffs represented that "they [would] not knowingly . . . produce child pornography or obscenity," and even if they did, "they could not contend that their speech would be 'arguably affected with a constitutional interest,'" <u>id.</u> at 1193 (citations omitted), the District of Columbia Circuit held that "a litigant must demonstrate a credible threat of prosecution under a statute that appears to render the litigant's arguably protected speech illegal [and the p]laintiffs in th[at] case ha[d] not met that essential requirement and therefore ha[d] failed to assert an injury in fact with respect to their challenge," <u>id.</u> at 1194 ("Here, as [the] plaintiffs admit, the forfeiture provisions are not 'aimed' at them.  They are aimed instead at those who [knowingly] produce and distribute child pornography and obscene material.").  Like the plaintiffs in <u>Barr</u>, Backpage.com has not argued that it will knowingly host advertisements for sex trafficking, and if it did, it could not argue that such speech is arguably affected with a constitutional interest.  And, while it might be true that some Congressional members had Backpage.com in mind when enacting the SAVE ACT, the statute is "aimed" at individuals who knowingly advertise or benefit from advertising sex trafficking.  <u>See</u> 18 U.S.C. § 1591(a).  Thus, the same conclusion must apply – Backpage.com does not have standing to bring this pre-enforcement challenge to the SAVE Act.

Moreover, even assuming that Backpage.com intended "to engage in a course of conduct arguably affected with a constitutional interest, [and] proscribed by [the SAVE Act]," <u>Susan B. Anthony List</u>, __ U.S. at __, 134 S. Ct. at 2334, it nonetheless could not show the existence of a

credible threat of prosecution under the SAVE Act[6] because its interpretation of the mens rea

requirement of the SAVE Act is inaccurate. Backpage.com argues that "the mens rea

requirement in the . . . SAVE Act was enacted to require a higher mens rea for one who

'advertises,' i.e., the party placing the ad, while the lesser standard of reckless disregard may

apply to a party like a website that may benefit financially from the 'advertising.'"  Compl. ¶ 5.

In other words, Backpage.com contends that a website, like itself, "could be convicted pursuant

to § 1591(a)(2) in connection with advertising related to sex trafficking based on proof of

'reckless disregard' rather than actual knowledge that an 'advertisement or communication was

for sex trafficking of an adult or a minor.'"  Gov't Mem. at 13 (citing Compl. ¶¶ 63–64).  But,

the Court does not find that the plain reading of § 1591(a)(2) supports this interpretation because

"[§] 1591(a) allows for conviction based on a mens rea of 'reckless disregard,' rather than

knowledge, 'except where the act constituting the violation of paragraph (1) is advertising.'"

Gov't Mem. at 13 (citing 18 U.S.C. § 1591(a)).  As the government aply notes,

> [t]he statutory language does not limit this exception to prosecutions pursuant to
> § 1591(a)(1).   Section 1591(a)(1) contains the list of 'acts' at issue, see id.
> § 1591(a)(1) (listing such acts as 'recruits, entices, harbors, transports, provides,
> obtains, advertises, maintains, patronizes, or solicits').   Id. § 1591(a)(1).   The
> offense set forth in § 1591(a)(2) is then defined by reference to the same 'act[s]
> described in violation of paragraph (1).'  Id. § 1591(a)(2).   Thus, 'the act
> constituting the violation of paragraph (1)' will be 'advertising,' regardless of
> whether an individual is charged pursuant to § 1591(a)(1) as someone who
> 'advertises,' or pursuant to § 1591(a)(2) as someone who 'benefits . . . from
> participation in a venture which has engaged in [advertising].'

Gov't Mem. at 14.  Section 1591(a) then provides the following as the mens rea requirement

that applies to an individual who commits or benefits from one of the proscribed acts in

---

[6] Backpage.com argues that when "statutes that facially restrict expressive activity by the class to which the plaintiff belongs, the court will assume a credible threat of prosecution in the absence of compelling contrary evidence." Pl.'s Opp'n at 16 (citing Reno, 31 F. Supp. 2d at 480).  But, because the SAVE Act does not facially restrict Backpage.com's expressive activity of hosting legal third party advertisements, or at least Backpage.com has not alleged that the SAVE Act imposes such a restriction, Backpage.com's reliance on this language to demonstrate a credible threat of prosecution is misplaced.

connection with human sex trafficking: "knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact." § 1591(a) (emphasis added). Thus, the statute provides two mens rea standards, and the insertion of the word "or" after the word "knowing," which establishes the first mens rea standard, explicitly demonstrates Congress' intent to impose a second mens rea standard. And, the insertion of the phrase, "except where the act constituting the violation of paragraph (1) is advertising," after the word "or," indicates Congress' intent to exclude the act of "advertising" from the mens rea standard of reckless disregard. Consequently, where the act constituting a violation of the statute is advertising, a conviction under § 1591(a) requires a "knowing" mens rea standard, and therefore, the plain reading of § 1591(a) does not support Backpage.com's interpretation.[7]

## IV.   CONCLUSION

Because Backpage.com has not alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the SAVE Act]," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2334, and because Backpage.com has not demonstrated that a credible threat of prosecution under the SAVE Act exists, Backpage.com has not demonstrated an injury-in-fact sufficient to confer standing to bring this pre-enforcement action. Accordingly, the Court does not find this matter justiciable, as this Court lacks the requisite subject matter jurisdiction to consider the merits of Backpage.com's constitutional

---

[7] In its complaint, Backpage.com cites multiple statements in the legislative history of the SAVE Act by Congressional members which support the Court's plain reading of § 1591(a) that the requisite mens rea standard for a violation of the statute regarding advertising is the "knowing" standard. See Compl. ¶ 40(a)–(c) (quoting various statements by Congressional members) (i.e., (1) "'[S]ome have raised questions about how the advertising prohibitions under this bill would apply to online companies,' but 'the standard of mens rea' protects websites that 'wind up finding things on their site that they may not have had anything to do with'"; (2) "The 'knowingly standard' 'emphatically' refutes concerns that the 'net might be too broad' because a website 'will not be caught up if an advertisement for sex trafficking appears without their knowledge'"; and (3) "I want the legislative history of this bill to show that 'knowingly' is import"; the bill was 'carefully crafted' so that 'Internet companies and legitamte Web sites are protected' unless '[t]hey . . . know that they are advertising for victims of human trafficking'").

challenge claims.  Also, because the Court concludes that it must dismiss Backpage.com's pre-enforcement challenge for lack of subject matter jurisdiction, the Court need not consider the government's alternative argument to dismiss the complaint for failure to state a claim under Rule 12(b)(6).

For all of the foregoing reasons, the Court grants the government's motion to dismiss the complaint in this case on the basis that it lacks subject matter jurisdiction to entertain this matter.

**SO ORDERED** this 24th day of October, 2016.[8]

REGGIE B. WALTON
United States District Judge

---

[8] An Order consistent with this Memorandum Opinion is issued simultaneously with this opinion.